**Richard W. HOSTROP, Plaintiff-Appellant,**

v.

**BOARD OF JUNIOR COLLEGE DISTRICT NO. 515, COUNTIES OF COOK AND WILL, AND STATE OF ILLINOIS, a body politic and corporate, et al., Defendants-Appellees.**

**No. 72–1285.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 1, 1972.

Decided Dec. 21, 1972.

Elmer Gertz, William Lee Carrier, Wayne B. Giampietro, Chicago, Ill., James Pappas, Chicago Heights, Ill., for plaintiff-appellant.

Bruce Mackey, Anthony Scariano, James C. Franczek, Chicago Heights, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and PELL, Circuit Judge.

CASTLE, Senior Circuit Judge.

Appellant Richard W. Hostrop appeals the action of the district court dismissing his civil rights complaint against the Board of Junior College District No. 515 and its members for failure to state a claim upon which relief can be granted. The basic question on this appeal is whether the rights of free expression and procedural due process traditionally given to teachers and other public employees extend also to a college president who was hired to act as the direct agent of a school board.

Plaintiff Hostrop's complaint alleged the following facts, which we shall take as true for the purposes of this appeal. Hostrop was appointed President and chief administrative officer of Prairie State Junior College in Chicago Heights, Illinois by the defendants through a series of contracts which extended his tenure until June 30, 1972.[1]  On May 25,

1. Defendants challenged the validity of the contracts executed by the Board and Hostrop in their memorandum filed with the district court, but this issue was not resolved.

1970, as part of his official duties, plaintiff prepared a confidential memorandum for circulation among his administrative staff which requested that the staff consider certain proposed changes in the college's ethnic studies program for discussion at the next staff meeting. After an unknown person made a copy of this memorandum public, certain defendants questioned Hostrop's right to make such a proposal and told him that it was a breach of his administrative duties and was not a matter of free expression. On July 13, 1970, plaintiff was summoned to the office of counsel which the Board had recently hired and told that he had the choice of resigning or taking the consequences of being fired. The publication of the memorandum was mentioned as being a prime reason for Hostrop's termination, although he was told that he would be fired without any notification of the charges against him. Ten days later the Board met and terminated Hostrop's contract without giving him any hearing or opportunity to speak in his defense. A list of charges that supposedly justified his termination was given to Hostrop some time later.[2]

Plaintiff's complaint concluded that the alleged facts showed a deprivation of his right to free speech and a denial of due process of law, and asked that the court order the college to give him a full and complete hearing, enjoin the defendants from replacing him with another person as president, and declare that his dismissal violated his first amendment rights. A second count of the complaint alleged the same facts as the first count plus the facts that the defendants had violated the Illinois anti-secrecy statute and that the plaintiff had suffered both mental strain and financial loss because of the defendants' conduct. This count asked for recovery of actual damages of $100,000 and punitive damages of $500,000.

The district court dismissed the complaint for failure to state a claim upon which relief can be granted,[3] Hostrop v. Board of Junior College District No. 515, 337 F.Supp. 977 (N.D.Ill.1972), finding that Hostrop's position as a college president directly responsible to the Board required that he be loyal to the Board and maintain its confidence in him as conditions of his continued employment. Reasoning from a remark in Pickering v. Board of Education, 391 U. S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that first amendment rights of persons in personal and intimate working relationships with their superiors may be restricted, the court found that Dr. Hostrop's position *vis-à-vis* the Board required that his right to make public statements or to disagree with the Board be limited. 337 F.Supp. at 978–979. Applying the test of Cafeteria Workers v. McElroy, 367 U.S. 886, 81 S. Ct. 1743, 6 L.Ed.2d 1230 (1961), to balance the interests of the Board against those of Dr. Hostrop, the court found that the need of the Board to have wide

---

2. This belated submission of the reasons for dismissal listed such things as the failure of Hostrop to devote full time to his duties, his withholding of information from the Board, his failure to give attention to certain college problems, and his attempt to mislead the Board during the negotiations for the extension of his contract. Preparation of the ethnic studies memorandum was not specifically mentioned as a reason for dismissal, although one charge stated that "Hostrop failed adequately and competently to deal with the administration of the Black Studies Program, causing both the students at the college and the Board grave concern."

3. The record shows that defendants moved for summary judgment on May 7, 1971. The deposition of Dr. Hostrop was filed with the clerk of the district court on June 1, 1971, and supporting affidavits and exhibits were filed in July and October. The district court treated the defendants' motion as a motion to dismiss in its opinion dated February 1, 1972, stating that no deposition had been filed. We have not considered the contents of the deposition for the purpose of disposing of this appeal, since it was never considered by the district court.

discretion in deciding to fire its presidents without asserting reasons outweighed any need of the plaintiff to know the reasons for his dismissal and any harm to his professional career. 337 F.Supp. at 980.

Initially, we note that the disposition of a motion to dismiss for failure to state a claim in a case such as this one is an extremely difficult task. As the district court recognized, resolution of the issues requires an analysis of the working relationship between Dr. Hostrop and the Board and a balancing of the various competing interests of each. Unfortunately, the record at this stage of the litigation does not clearly define the working relationship between the parties. It does not indicate how closely Hostrop had to follow the dictates of the Board—how often he met with the Board, how much power he had to formulate educational policy with the Board's blanket approval, or whether he had any ability to debate Board members on certain issues that would be decided by a vote of the Board. A consideration of these factors would indicate more clearly whether Hostrop's right to make his recommendations or to disagree with the Board had to be limited, as the district court asserted, "[i]n order for the working relationship between them to be effective." Similarly, the record does not identify the nature of the competing interests or the extent to which they are irreconcilable—how a hearing procedure would interfere with the discretion of the Board in hiring and firing personnel, whether other administrators were granted hearings before action was taken against them, and what the effects of the hearings given others actually were. With these shortcomings in the record in mind, we turn to the allegations of the complaint.

## I. *Preparation of the Memorandum As a Ground for Discharge*

Plaintiff argues on this appeal that the protections that have traditionally been given to the speech and associations of academicians [4] should extend also to his circulation of the ethnic studies memorandum. It is true that the judiciary has steadfastly construed the concept of freedom of expression broadly as a means of prompting vigorous, robust debate,[5] and that it has consistently rejected attempts to formulate absolute rules which would restrict the first amendment rights of whole classes of individuals, whether they be students,[6] campus speakers,[7] school newspaper editors,[8] student organizers,[9] or teachers.[10] Against this commitment to academic freedom, defendants are asking this court to excise a class of academic personnel who will have no first amendment rights.

Defendants argue that college administrators like Dr. Hostrop can be discharged whenever they circulate proposals that might offend the sensibilities of the Boards that hired them, for their jobs require that they do not offend the

4. Healy v. James, 408 U.S. 169, 180–181, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Keyishian v. Board of Regents, 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Wieman v. Updegraff, 344 U.S. 183, 196, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (Frankfurter, J. concurring).

5. New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), Donahue v. Staunton, 471 F.2d 475, at 481 (7th Cir. 1972); Kiiskila v. Nichols, 433 F.2d 745, 748 (7th Cir. 1970).

6. Tinker v. Des Moines School District 393 U.S. 503, 513, 89 S.Ct. 733, 21 L.Ed. 2d 731 (1969), Breen v. Kahl, 419 F.2d 1034, 1036–1037 (7th Cir. 1969), cert. denied, 398 U.S. 937, 90 S.Ct. 1836, 26 L.Ed.2d 268 (1970).

7. Brooks v. Auburn University, 412 F.2d 1171, 1172 (5th Cir. 1969).

8. Scoville v. Board of Education, 425 F.2d 10, 13 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

9. Healy v. James, 408 U.S. 169, 186, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972).

10. Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); McLaughlin v. Tilendis, 398 F.2d 287, 288–289 (7th Cir. 1968).

Boards. Defendants rely upon language from Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), to differentiate between teachers and administrators, one class which may dissipate the confidence of the school board by making certain statements, and one class which cannot afford to:

> The statements are in no way directed towards any person with whom appellant would normally be in contact in the course of his daily work as a teacher. . . . Appellant's employment relationships with the Board, and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning.
>
> \*   \*   \*   \*   \*   \*
>
> It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal. Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined. We intimate no views as to how we would resolve any specific instances of such situations, but merely note that significantly different considerations would be involved in such cases.

*Id.* at 569–570, n. 3, 88 S.Ct. at 1735. Defendants submit that personal loyalty and confidence are necessary for the proper functioning of the working relationship between Dr. Hostrop and themselves, and that since the circulation of the ethnic studies memorandum could have arguably affected this loyalty and confidence, Hostrop can be discharged.

■   We do not interpret the above-quoted remarks from *Pickering* so as to support defendants' position on this appeal, especially when that case is placed within the context of other first amendment decisions. It has been consistently held that a government cannot punish a person for his speech alone, but only for speech that causes substantial disruption or that hinders the functioning of the state.[11] In this perspective, *Pickering* should not be read to authorize the discharge of a college president merely because he expresses an opinion that could be interpreted as a sign of disloyalty or an undermining of the confidence placed in him. Instead, *Pickering* holds that an employee's speech may be regulated only if a public entity can show that its functions are being substantially impeded by the employee's statements. Donahue v. Staunton, 471 F.2d 475, at 483 (7th Cir. 1971) (Swygert, C. J. dissenting). We find that Dr. Hostrop's suggestions about the ethnic studies program which appear in the complaint cannot, on their face and by themselves, be taken as a serious impairment of the effectiveness of the working relationship between him and the Board that the defendants could discharge him merely for making the suggestions.[12]

---

11. Grayned v. City of Rockford, 408 U.S. 104, 118, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); Cohen v. California, 403 U.S. 15, 23, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971); Tinker v. Des Moines School District, 393 U.S. 503, 513–514, 89 S. Ct. 733, 21 L.Ed.2d 731 (1969); Terminiello v. Chicago, 337 U.S. 1, 4, 69 S. Ct. 894, 93 L.Ed. 1131 (1949).

12. An important distinction between *Pickering* and the instant case is that teacher Pickering engaged in criticism

of the school board and that Dr. Hostrop merely made a suggestion for a change in curriculum. It is unclear from *Pickering* whether the Supreme Court thought that criticism of a superior by an employee in a close working relationship with him would be analogous to the speaking of "fighting words" so that the state could discharge the employee merely because he spoke the words of criticism, or whether the state would have to prove that the working relationship between

Absent actual proof of such an impairment, the face of the pleadings shows no reasons to deny Dr. Hostrop's first amendment rights. It was therefore error to dismiss his complaint for failure to state a cause of action on first amendment grounds.[13]

In fact, the general guidelines drawn by *Pickering* for deciding whether an employee's speech should be restricted support Dr. Hostrop's first amendment right to propose changes in the curriculum of Prairie State Junior College. *Pickering* recognizes that the position of the person seeking to express his views and the nature of the controversy to which he is directing his comments are important factors to consider in determining whether his freedom of expression should be protected. 391 U.S. at 571–572, 88 S.Ct. 1731. The Court recognized that teachers, because of their position in the educational system, are able to make significant contributions to the public debate concerning the allocation of educational funds that precedes public votes. Here, Dr. Hostrop, because of his background and leadership position as college president, sought to contribute to the discussion of a curriculum issue that would be decided by vote of the Board. To silence "vigorous and robust debate" in the formulation of educational policy on the administrative level would certainly be contrary to the spirit of the Pickering decision.[14]

Plaintiff's allegation that he was discharged merely for circulating the memorandum entitles him to relief under another legal theory distinct from his assertion of his right to freedom of expression. Plaintiff alleged that he circulated the memorandum as part of his official duties, and that it was only several days after it had become public that the members of the Board told him that he had no right to express his views in such a way and that he would be terminated because of this expression. These facts clearly show arbitrary action on the part of the defendants which the due process clause was meant to prevent. Plaintiff, as a public employee, is entitled to be protected from retaliation for actions which he had every reason to believe were a part of his assigned duties. The facts alleged in his complaint indicate that he has a cause of action resulting from the deprivation of substantive due process. Conway v. DuPont School District, 333 F. Supp. 1217, 1220 (D.Del.1971); *cf.* Downs v. Conway School District, 328 F.Supp. 338, 348–349 (E.D.Ark.1971);

---

the two had deteriorated because of the criticism so that the two could no longer work effectively together.

In both Lefcourt v. Legal Aid Society, 312 F.Supp. 1105 (S.D.N.Y.1970), aff'd, 445 F.2d 1150 (2d Cir. 1971), and Watts v. Seward School Board, 454 P.2d 732 (Alas.1969), cert. denied, 397 U.S. 921, 90 S.Ct. 899, 25 L.Ed.2d 101 (1970), employees were discharged for a series of confrontations and incidents which cumulatively destroyed the efficiency of the governmental units for which the employees worked. Furthermore, in both cases the action of the government employer in discharging the employees was upheld only after a trial court heard evidence relating to the kind of criticism involved and its actual effects.

13. The district court did not decide whether the memorandum was distributed publicly or privately, but thought this issue was important because of its view that the first amendment does not protect private communications. This point was not argued on appeal. Past decisions have extended the first amendment to protect private statements made by public employees, Muller v. Conlisk, 429 F.2d 901 (7th Cir. 1970); Swaaley v. United States, 376 F.2d 857, 863, 180 Ct.Cl. 1 (1967), and statements made by public employees in carrying out their assigned duties. Downs v. Conway School District, 328 F.Supp. 338 (E.D.Ark.1971); Mailloux v. Kiley, 323 F.Supp. 1387, 1392 (D.Mass.), aff'd, 448 F.2d 1242 (1st Cir. 1971).

14. We recognize that defendants may demonstrate at trial that Dr. Hostrop's circulation of the memorandum was evidence of insubordination and actually produced the harmful effects which the *Pickering* decision indicated may be grounds for discharge.

Such evidence could justify the discharge.

Mailloux v. Kiley, 323 F.Supp. 1387, 1392 (D.Mass.), aff'd, 448 F.2d 1242 (1st Cir. 1971).

## II. Denial of a Pre-Discharge Hearing

■ The threshold inquiry in determining whether a complaint states a cause of action based on the denial of procedural due process is whether the plaintiff has shown that the state has infringed upon a personal interest protected by the fourteenth amendment—either life, liberty, or property. Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), Lipp v. Board of Education, 470 F.2d 802, at 804, n. 3 (7th Cir. 1972). If the complaint does assert the deprivation of a protected interest, due process of law requires that certain procedural safeguards be extended before the state can extinguish that interest. Defendants argue that plaintiff has asserted no interests worthy of due process protection. They also argue that they should have unfettered discretion to hire and fire presidents as a means of expediently carrying out their statutory duties, and that this necessity outweighs any interest of the plaintiff in receiving any kind of hearing before his termination.

■ We find that plaintiff's complaint alleges at least two protected interests which the defendants have infringed upon, and that plaintiff was entitled to some form of hearing before his discharge. Plaintiff's complaint makes a credible showing of a deprivation of "liberty" as it is defined in Board of Regents v. Roth, 408 U.S. at 573, 92 S.Ct. 2701. A person is deprived of "liberty" if the state damages his standing in the community by charging him with an unsavory character trait such as dishonesty or immorality. Plaintiff's complaint alleges facts showing an attack by defendants on his veracity, for the list of charges which the defendants submitted to justify his dismissal accused him of misrepresentations, supplying false information, and withholding important information. In such a case, due process must provide notice and an opportunity to refute such charges. *Id.* Plaintiff's complaint also alleges facts showing a deprivation of "property" as it is defined in *Roth, Id.* at 576–578, 92 S.Ct. 2701. A person is deprived of property if the government extinguishes his legitimate claim of entitlement to his job. The complaint alleges that Dr. Hostrop had a legitimate claim of entitlement to the position of President of Prairie State Junior College at the time he was discharged on July 23, 1970, for defendants had agreed to employ him until June 30, 1972 under the terms of a series of employment contracts. A term of employment set by contract has been recognized as a property interest which the state cannot extinguish without conforming to the dictates of procedural due process. Perry v. Sindermann, 408 U.S. 593, 601, 92 S. Ct. 2694, 33 L.Ed.2d 570 (1972), Board of Regents v. Roth, 408 U.S. at 576–577, 92 S.Ct. 2701. The existence of such a contractually-established property interest obligates the Board to grant plaintiff a hearing where he can be fully informed of the reasons for his nonretention and challenge their sufficiency.[15]

■ Having found that plaintiff has asserted protected interests that are en-

15. The fact that plaintiff relies upon his employment contract to establish a property interest worthy of protection through the due process clause does not mean that his only remedy is a contract action in state court. A civil rights action based on the deprivation of due process and a contract action to recover damages for a breach are independent remedies. The civil rights action based on deprivation of a property interest established by contract seeks vindication for the arbitrary manner in which the contract was breached. A "garden variety" contract action seeks damages only for the losses caused by the breach once it has occurred in any manner whatsoever. There will be occasions when one action will lie but the other will not, as when the state has grounds to break an employment contract, but does so by violating an employee's due process rights to notice and a hearing.

titled to due process procedural safeguards, we must balance the interests of the state against those of the individual to determine the form of hearing that Dr. Hostrop is entitled to before his termination. Board of Regents v. Roth, 408 U.S. at 570, 92 S.Ct. 2701, 33 L.Ed. 2d 548. The Board's interest consists of maintaining efficiency through the prompt removal of its chief administrator when it reasonably believes that it can no longer work effectively with and through that person. But it is questionable whether efficiency is a compelling interest,[16] so that this consideration should work to deny a hearing for one college president when courts have rejected it as a rationale for denying hearings to thousands of other employees. *See* Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); Kennedy v. Sanchez, 349 F.Supp. 863 (N.D.Ill.1972). Dr. Hostrop's interests lie in protecting his first amendment rights and future employment prospects and in avoiding dismissal when it is not justified by the facts. We find that the resolution of these interests requires that plaintiff be given a notice of the charges against him, notice of the evidence upon which the charges will be based, a hearing before a tribunal possessing apparent impartiality, and a chance to present witnesses and confront adverse evidence at the hearing. Board of Regents v. Roth, 408 U.S. at 570 n. 7, 92 S.Ct. 2701, 33 L.Ed.2d 548; Ferguson v. Thomas, 430 F.2d 852, 856 (5th Cir. 1970); Kennedy v. Sanchez, 349 F.Supp. 863, 865 (N.D.Ill.1972). *See also*, Lucas v. Wisconsin Electric Power Company, 466 F. 2d 638, 652 n. 30 (7th Cir. 1972). We recognize that there are differences between college administrators and teachers so that the Board may have different justifiable grounds for dismissing its president. A court that may be called upon to review the findings of an administrative hearing which results in the discharge of a college president will have to take the particular duties of the president and his working relationship with the school board into account.

We find that the plaintiff has stated valid causes of action showing that he was deprived of his first amendment right to free expression and his fourteenth amendment right to due process of law. Accordingly, we remand this case to the district court for the consideration of the causes of action the plaintiff has pleaded.

Reversed.

---

16. "The price which a government must pay to protect the constitutional liberties of its employees is some loss of the efficiency enjoyed by private employers; the Supreme Court has repeatedly decided that the value of those individual liberties is well worth the cost." Illinois State Employees Union, Council 34 v. Lewis, 473 F.2d 561, at 575 (7th Cir. 1972).