Marion deV. COTTEN, Plaintiff,

v.

BOARD OF REGENTS OF the UNIVERSITY SYSTEM OF GEORGIA et al., Defendants.

Civ. A. No. 1799.

United States District Court,
S. D. Georgia,
Augusta Division.

June 13, 1974.

John B. Long, Augusta, Ga., for plaintiff.

Gould B. Hagler, Augusta, Ga., and Alfred L. Evans, Jr., Asst. Atty. Gen., Atlanta, Ga., for defendants.

## MEMORANDUM ON CROSS MOTIONS FOR SUMMARY JUDGMENT

ALAIMO, District Judge.

This is a civil rights action seeking damages as well as injunctive and declaratory relief upon allegations that the defendants deprived the plaintiff of his interests in "property" and "liberty" in violation of the First and Fourteenth Amendments to the Constitution of the United States. The plaintiff's substantive allegations are summarized by this Court's order of October 18, 1973, sustaining the legal sufficiency of the complaint. A complete record having now been developed through discovery, and all parties having moved the Court for summary judgment thereupon, the Court concludes that this action is ripe for disposition. Therefore, the following findings, conclusions, and judgment are entered pursuant to Rule 56, Fed.R.Civ.P.[1]

The plaintiff, Dr. Marion deV. Cotten, a professor of pharmacology and scholar of national reputation, was appointed in July of 1970 to serve on the faculty of the Pharmacology Department of the Medical College of Georgia. Under the terms of this initial one-year employment contract, and two successive one-year contracts, Dr. Cotten was to devote 40% of his professional time to his teaching responsibilities and to receive 40% of his salary from funds allocated to the Medical College of Georgia. The 60% remainder of his professional time, for like consideration, was to be devoted to editorial responsibilities arising from his editorship of two prominent scientific journals, *The Journal of Pharmacology and Experimental Therapeutics* and *Pharmacological Review*. No contract of employment was offered Dr. Cotten for a fourth year and his relationship with the Medical College of Georgia lapsed on July 1, 1973.

The decision to non-renew Dr. Cotten's contract was reached by Dr. Curtis H. Carter, Dean of the School of Medicine, on January 30, 1973. That action reflected Dean Carter's judiciously derived "value judgment" that the internecine warfare raging within the School of Medicine could be concluded only by ending Dr. Cotten's relationship with the Medical College. The disharmony which had become evident to all concerned parties was occasioned by an irreconcilable personality conflict between Dr. Cotten and his immediate superior, Dr. Raymond Ahlquist, Chairman of the Department of Pharmacology. Faced with such circumstance, Dean Carter determined that the interests of the institution mandated the conclusion that Dr. Cotten should not be offered a renewal contract for a fourth year despite a unanimous consensus of high regard for Dr. Cotten's teaching ability.

There is no material issue of fact concerning the underlying conflict between Drs. Cotten and Ahlquist. Indeed, the record is replete with instances of expressions of criticism directed toward

---

1. Since the judgments following this Memorandum dispose of the action, at this time, the Court feels that a painstaking review of the evidence is appropriate.

these eminent medical educators by one another.

The record reflects that the initial manifestations of such conflict occurred during Pharmacology Departmental meetings in July and August of 1971. At such times, Dr. Ahlquist reacted negatively to certain criticisms which Dr. Cotten had leveled toward the graduate program in Pharmacology. At the termination of the August meeting, Dr. Ahlquist specifically relieved Dr. Cotten of all responsibility for graduate students until such time as he became a member of the graduate faculty. Dr. Ahlquist stated that his stance in this regard was precipitated by various considerations. Primarily, he felt that Dr. Cotten should be partially responsible for strengthening the program by becoming a member of the graduate faculty if he felt that he had identified a source of weakness in the department. Dr. Ahlquist also noted the fear of other departmental members that Dr. Cotten's disdain for their teaching and research efforts could adversely affect their academic reputations. Finally, he considered the possibility that such criticism could hinder the employment efforts of the concerned graduate students in view of Dr. Cotten's national academic standing. From that point forward, the situation deteriorated.

A primary source of conflict which developed during 1972 concerned Dr. Cotten's relationship with the Department of Medicine. In February of 1972, Dr. Albert Carr, head of the section of Hypertension in the Department of Medicine, sought Dr. Cotten's assistance in drafting a special project grant application for the establishment of a program in Clinical Pharmacology. The completed draft was later presented for approval to Dr. Ahlquist who agreed that the special project should be administered through the Department of Medicine with the participation of Dr. Cotten. He did object, however, to the inclusion of a budgetary item for a salary grant for Drs. Cotten and Mary Ella Logan of the Department of Pharmacology for the reason that such item should not have been included prior to consultation with him as these persons' department head. While Dr. Ahlquist reluctantly approved the application despite this objection, he never approved utilization of Dr. Cotten by the Department of Medicine to teach a seminar in Clinical Pharmacology outside of the project addressed by the application.

In the spring of 1972, a program in Clinical Pharmacology was formed in the Department of Medicine despite the failure of the Medical College to receive the aforementioned grant. Dr. Cotten was assigned, apparently by Dr. Carr as head of the section of Hypertension and Clinical Pharmacology, to teach a seminar in clinical pharmacology. Shortly thereafter, either Dr. Cotton or Dr. Carr suggested to Dr. Alfred J. Bollet, Chairman of the Department of Medicine, that Dr. Cotten be given a joint appointment in the Department of Medicine. Some dispute thereafter arose regarding the manner of processing of the recommendation for a joint appointment in that the appropriate forms were prepared and presented to Dr. Ahlquist for his signature before consultation with him regarding the advisability of such appointment. While Dr. Bollet ascribed this irregularity to administrative error, there is no dispute that the proposal for the joint appointment was intentionally designed in part to remove Dr. Cotten from the administrative supervision of Dr. Ahlquist. Indeed, subsequent to the non-renewal of Dr. Cotten's contract, there was some discussion of the feasibility of paying Dr. Cotten through the Department of Medicine. Furthermore, the clinical pharmacology scheme within the Department of Medicine was clearly intended partially to remove the teaching of pharmacology from the influence of Dr. Ahlquist. Dr. Bollet unequivocally states by deposition: "In our discussions in the Department of Medicine . . . between me and Dr. Cotten, we purposely tried to leave Ahlquist out of this teaching program, and that's one

of the things he complains about here, and we knew he would object to this and complain about it, but we did it with malice aforethought, if you will, because we felt that his teaching at the moment was ineffective even though he is a nationally renown figure in Clinical Pharmacology." Dr. Bollet further states by deposition that Dr. Cotten was severely critical of Dr. Ahlquist on numerous occasions, that he explicitly advised against including Dr. Ahlquist in the clinical pharmacology program, and that the express purpose of establishing clinical pharmacology in the Department of Medicine was to substitute a strong program for the weak program administered by Dr. Ahlquist through the Department of Pharmacology.

A second major bone of contention concerned Dr. Cotten's appointment to the Admissions and Stipend Committee of the graduate school by Dr. Edward Bresnick, Dean of the School of Graduate Studies. This appointment was approved by the Graduate Council, over Dr. Ahlquist's objection, on June 27, 1972. Again, Dr. Ahlquist presented his view that Dr. Cotten should refrain from participating in graduate activities without first becoming a member of the graduate faculty. Dr. Ahlquist stated he feared that non-accountability on Dr. Cotten's part for the graduate program in pharmacology combined with his expressed low esteem for the graduate program might influence his actions in reviewing student applications for stipends to study in the Department of Pharmacology. Dr. Bresnick rejected Dr. Ahlquist's objection because of his feeling that the real issue arose from the personality conflict between Drs. Cotten and Ahlquist. Dr. Bresnick was personally familiar with such conflict because he had heard Dr. Cotten criticize Dr. Ahlquist as being too emotional and overbearing in his capacity as head of the Department of Pharmacology. He had also heard Dr. Cotten criticize the graduate program in pharmacology and suggest that he could not work effectively with Dr. Ahlquist.

By the fall of 1972, the controversy was at a high pitch and was causing considerable consternation in the Department of Pharmacology. Several faculty members were fully aware of Dr. Cotten's criticism of Dr. Ahlquist and feared the consequences of this rupture of good relations. In September of 1972, some members of the Pharmacology staff openly discussed with Dr. Ahlquist the feasibility of non-renewal of Dr. Cotten's contract.

Against this background Dr. Carter, in his capacity as Dean of the School of Medicine, began attempting to effect a reconciliation between the two scholars in order that the Medical College might retain the exemplary services of both in an environment conducive to the advancement of the institution. He met with Drs. Cotten and Logan on September 25, 1972, in an attempt to identify some means of resolution. At that meeting and later during a chance encounter with Dr. Cotten, the latter expressed considerable criticism of Dr. Ahlquist but apparently offered no concrete proposal for a solution to the problem. On September 29, 1972, Dr. Carter summoned Drs. Ahlquist and Cotten to meet with him for an open discussion of their conflict. Dr. Cotten was unresponsive to various inquiries during this meeting and displayed considerable anger during the course of the conversation. No resolution was effected and Dr. Carter received a note from Dr. Ahlquist on January 3, 1973, suggesting that no progress had been made in improving the relationship. This message prompted Dr. Carter to solicit the advice of the provost of the institution, Dr. Robert A. Liebelt. Thereafter, Drs. Carter and Liebelt met with Dr. Ahlquist in another attempt to determine a method for improving the working relationship within the Department of Pharmacology. The two administrators then met with Dr. Cotten and received his suggestion that he be transferred to the Department of Medicine. Dr. Carter concluded from these meetings and from other informa-

tion that had come to his attention that the conflict was insoluable under the existing circumstances. At that time he suggested to Dr. William H. Moretz, President of the Medical College of Georgia, that he anticipated that a value judgment would have to be made by the administration to conclude the conflict.

By letter of January 22, 1973, Dr. Ahlquist recommended renewal of Dr. Cotten's contract but indicated that a discussion between himself and Dr. Cotten on January 19, 1973, had proved futile in reaching a resolution. Dr. Carter then directed Dr. Ahlquist to continue seeking some expression of positive cooperation and to advise by January 30, 1973, as to whether he could recommend renewal without reservation. On January 30, 1973, Dr. Carter, in the exercise of his sound judgment, advised Dr. Cotten that no contract would be offered him for the ensuing year. Throughout the remainder of the school year, Dr. Carter continually voiced the suggestion that the administration would be open for renegotiation if Dr. Cotten would reach an amiable solution with Dr. Ahlquist. No action was taken on such suggestions and these legal proceedings were commenced on June 8, 1973.

The Court finds as undisputed fact that an irreconcilable conflict existed between Drs. Cotten and Ahlquist; that Dr. Cotten openly criticized Dr. Ahlquist on numerous occasions to Drs. Logan, Carr, Bollet, and Bresnick; and that the ill feeling between the two men contributed significantly to a condition of disharmony within the School of Medicine and the Department of Pharmacology. The Court further finds as undisputed fact that the decision to nonrenew Dr. Cotten's contract was reached by Dr. Carter after extensive efforts at effecting a reconciliation, that such decision reflected Dr. Carter's value judgment that a restoration of harmony within the School of Medicine and Department of Pharmacology outweighed the advantage which would enure to the institution in the retention of Dr. Cotten's services, that such consideration consti-

tuted the sole reason for Dr. Carter's action, that Dr. Carter never judged the merits of the underlying disputes between Drs. Cotten and Ahlquist, and that Dr. Carter never considered any exercise by Dr. Cotten of his First Amendment rights to freedom of speech and association in reaching his determination.

■ Dr. Cotten's contention that nonrenewal prior to a hearing deprived him of a protectable property interest in violation of the due process clause of the Fourteenth Amendment is without merit.

The record fails to support Dr. Cotten's claim of entitlement to continued public employment by the Medical College of Georgia. Under the rule of Ferguson v. Thomas, 430 F.2d 852, 856 (5th Cir. 1970),

" . . . a college can create an obligation as between itself and an instructor where none might otherwise exist under the legal standards for the interpretation of contract relationships regularly applied to transactions in the marketplace if it adopts regulations or standards of practice governing nontenured employees which create an expectation of reemployment."

In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court attempted to establish the appropriate reference for defining the type of property interest in public employment for which a person may claim Fourteenth Amendment due process protection. These property interests " . . . are created and their dimensions are defined by existing rules and understandings that stem from an independent source such as state law— rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth, supra,* at p. 577, 92 S.Ct. at p. 2709. The Supreme Court elaborated in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) by noting that the independent sources giving

rise to a protectable interest may be in the form of an implied contractual agreement or "unwritten common law" in a particular university that certain employees shall have the equivalent of tenure. Such eventuality is likely, noted the Court, in institutions which have no explicit tenure system even for senior faculty members.

■ A close scrutiny of the relationship between Dr. Cotten and the Medical College of Georgia reveals no basis, supportable by reference to state law, which would give rise to an expectation of re-employment upon any contractual theory. While the plaintiff suggests that several academic assignments and faculty committee appointments raise implied contractual rights, such was not the understanding of any of the deponents representing the Medical College of Georgia. Each testified that such assignments were routine and unrelated to employment commitments for the future. Indeed, it would be difficult to conclude that even a subjective expectation of re-employment existed in Dr. Cotten in view of the circumstance that he was in continual conflict with his immediate superior for at least one year prior to the non-renewal of the contract. Nor does the record contain evidence of an "unwritten common law" at the Medical College which could give rise to an expectation of re-employment. To the contrary, rights in continued employment at the Medical College are governed by an explicit tenure system, the existence of which weighs heavily against a finding of unwritten rules for the governing of employment rights. *See* Watts v. Board of Curators, University of Missouri, 363 F.Supp. 883 (W.D.Mo.1973) and Toney v. Reagan, 326 F.Supp. 1093 (N.D.Cal.1971) for cases holding that the existence of a formal tenure system wholly precludes tenure based upon an expectancy theory. Thus, this Court is constrained to conclude that Dr. Cotten's relationship with the Medical College was governed by

the express terms of his written contract of employment which fixed his tenure as "one year" and incorporated by reference Board of Regents Policy I–6 which specifies that any employment relationship subsequent to the expiration of a teacher's contract can only be established by the execution of a new contract.

■ Nor has Dr. Cotten established factual support for his contention that the action of the defendants damaged his reputation thereby depriving him of "liberty" and imposing a duty upon the State to afford a hearing to refute charges underpinning such damage. Here, as in *Roth, supra,* 408 U.S. at p. 573, 92 S.Ct. at p. 2707, "The State, in declining to rehire the [plaintiff], did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the non-renewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality." Thus, any alleged reputation damage here would have to be assumed from the mere fact that Dr. Cotten's contract was not renewed. Such assumption is impermissible. *See Roth, supra,* where the Court noted at page 574, n. 13, 92 S.Ct. at page 2707:

"The District Court made an *assumption* 'that non-retention by one university or college creates concrete and practical difficulties for a professor in his subsequent academic career.' 310 F.Supp. [972] at 979. And the Court of Appeals based its affirmance of the summary judgment largely on the premise that 'the substantial adverse effect non-retention is likely to have upon the career interests of an individual professor' amounts to a limitation on future employment opportunities sufficient to invoke procedural due process guarantees. 446 F.2d [806] at p. 809. But even assuming, *arguendo*, that such a 'substantial adverse effect' under these circumstances would constitute

a state-imposed restriction on liberty, the record contains no support for these assumptions. There is no suggestion of how non-retention might affect the respondent's future employment prospects. Mere proof, for example, that his record of non-retention in one job, taken alone, might make him somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.' "

■■ Further, the record is devoid of support for Dr. Cotten's theory that the defendants' action was constitutionally impermissible because taken for the purpose of punishing him for the exercise of his First Amendment rights to freedom of speech and association. While teachers unquestionably enjoy the First Amendment right to comment upon matters of public concern, Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and to offer constructive criticism of school policy under the umbrella of academic freedom, Hostrop v. Board of Junior College Dist. No. 515, etc., Ill., 471 F.2d 488 (7th Cir. 1972), "[T]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering, supra,* 391 U.S. at p. 568, 88 S.Ct. 1731, at p. 1735. *Accord* Ferguson v. Thomas, *supra.* The Supreme Court in *Pickering* indicated that vital considerations to be weighed in this balancing process should be whether the statements were directed toward a person with whom the speaker would normally be in daily contact, and whether the speech raised questions concerning either maintenance of discipline by immediate superiors or harmony among co-workers. The record amply demonstrates that Dr. Carter engaged in an agonizing balancing process in reaching the value judgment that Dr. Cotten's services could not be retained. Indeed, that process included pointed consideration of the very factors alluded to by the *Pickering* court. Thus, the actions of the defendants here under challenge were not constitutionally impermissible as violative of the First Amendment.

■ The plaintiff's challenge to the method of promulgation of the Regent's by-laws concerning a teacher's right to appeal a contract non-renewal does not raise a claim of violation of a substantial federal right. Matters of that genre constitute uniquely State causes of action. McDowell v. State of Texas, 465 F.2d 1342 (5th Cir. 1971), aff'd en banc 465 F.2d 1349 (5th Cir. 1972). Thus, no relief may be predicated upon such theory.

■ Finally, the plaintiff's claim of arbitrariness is patently meritless. The record is replete with instances of good faith attempts by the defendants to find alternative resolutions to the nagging problems created by the Ahlquist-Cotten conflict. Good and valid factors were continually weighed by the defendants and no showing of arbitrariness appears in the record.

In view of the foregoing findings of fact and conclusions of law, it is apparent that the motions for summary judgment by the defendants must be granted, and that the motion for summary judgment by the plaintiff must be denied.