**Lawrence TERRY and Pearline Terry, Plaintiffs,**

v.

**Don WOODS and Racine Unified School District, Defendants.**

**Civ. A. No. 91–C–710.**

United States District Court, E.D. Wisconsin.

Oct. 7, 1992.

T. Christopher Kelly, Madison, Wis., for plaintiffs.

Stephen P. Juech, Frish Dudek, Ltd., Milwaukee, Wis., for defendants.

## DECISION AND ORDER

REYNOLDS, Senior District Judge.

On March 20, 1992, defendants, a school district and its superintendent, moved for partial summary judgment on plaintiff Lawrence Terry's claim that his due process rights were violated when defendants temporarily suspended him from his position as principal. For reasons discussed below, the motion is granted.

## PROCEDURAL BACKGROUND

Plaintiffs Lawrence Terry ("Terry") and Pearline Terry, his wife, brought this action on July 1, 1991. Their amended complaint, filed January 13, 1992, alleges that defendants Racine Unified School District ("RUSD") and RUSD superintendent Don Woods ("Woods") subjected Terry to employment discrimination, deprived him of liberty and property without due process of law, and retaliated against him for filing an employment discrimination claim with the Equal Employment Opportunity Commission.

Relief is sought pursuant to 42 U.S.C. §§ 1983, 2000e–2, and 2000e–3. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e–5(f)(3).

## FACTS

Terry was suspended with pay on May 30, 1990. The suspension purportedly was based on Wood's conclusion that Terry, then principal at the Janes Elementary School ("Janes"), had implemented an im-

proper policy for dealing with emergency situations at the school, and had wrongly reprimanded a teacher who failed to comply with the policy. The suspension was to last until Woods could complete an investigation into these matters and determine whether disciplinary action should be taken against Terry. (Def.'s Mem. at Ex. G; Terry Aff. at Exs. C, D.)

The events leading up to the suspension began four days before it, when a teacher at Janes, Gail Winters, called the fire department to report a burning odor in her classroom. Terry was not told of the odor or of the call until fire department officials arrived. When they did, Terry used the school intercom to determine who had placed the call. Terry then took the fire department officials to Winters' classroom, where he told Winters that she should have informed him of the odor and of the call to the fire department. Winters says Terry "scolded" her with this instruction, in front of her students, and "in a very loud authoritative voice." (Def.'s Mem. at Ex. 3.) Terry characterizes his remarks not as a scolding or a reprimand but as an "observation." (Terry Aff. at ¶ 8.)

Shortly after the incident, Terry circulated a memorandum instructing Janes' staff members to inform Terry of any dangerous conditions at the school. (Terry Aff. at Ex. B.)

On May 29, 1990, the Racine Education Association ("REA"), a group of RUSD employees, filed a grievance with the RUSD Board of Education concerning Terry's performance as principal. The grievance and its accompanying letter criticized Terry for his policy of preventing teachers from directly calling emergency services, his reprimand of Winters, his regular absences from Janes, and his failure to conduct the required number of fire drills in the 1989–90 school year. Terry was said to have "threatened the lives of children by his actions." The REA demanded Terry's removal pending an investigation and stated that, if he were not removed, REA members would strike. (Def.'s Mem. at Exs. D, E.)

At Woods' direction, RUSD administrator Frank Osimitz ("Osmitz") on May 29 investigated the allegations contained in the grievance. After reading Osimitz' preliminary notes on the morning of May 30, Woods concluded "that there was sufficient evidence to be concerned about the judgment of Mr. Terry in handling his building when matters of safety for students and staff are involved." (Def.'s Mem. at Ex. F.) Later that day, Woods informed Terry in a three-paragraph letter that Terry would be suspended with pay, effective the following day, because his "follow-up" actions to Winters' fire department call were not "done in a satisfactory manner." (Def.'s Mem. at Ex. G.) The letter did not elaborate on the charges against Terry, and did not give him the opportunity to respond to any charges.

From the date of Terry's suspension until June 21, 1990, Osimitz gathered statements from students and staff members concerning Terry's safety policies and his reprimand of Winters. Terry's attorneys reviewed this information, conducted their own inquiry, and, on July 9, 1990, wrote a letter to Woods criticizing Osimitz' investigation and setting forth Terry's side of the story. (Def.'s Mem. at J.)

In a July 25, 1990 letter, Woods informed Terry that he had reviewed the materials provided by Osimitz and by Terry's attorneys and had concluded that it would not be "in the best interests of Janes School for [Terry] to return there as principal." Instead, Terry was made principal of Garfield Elementary School, where he was to report to work on July 26, 1990. (Terry Aff. at Ex. D.)

These decisions were said to be based on Woods' findings that Terry's comments to Winters amounted to a "public chastisement," and that Terry's unwritten policy requiring his prior approval of calls to emergency services created the potential for a dangerous delay in the provision of such services. Woods found that the evidence concerning the number of fire drills Terry had conducted was inconclusive. (Terry Aff. at Ex. D.)

Additional factual information is supplied below.

## ANALYSIS

The court will grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment has the initial burden of asserting the absence of any dispute of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court will draw all reasonable inferences from the record in favor of the non-moving party. *Johnson v. Pelker,* 891 F.2d 136, 138 (7th Cir.1989).

The moving party, however, need not "negate" its opponent's claim. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552. Rather, once the motion is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Celotex* at 324, 106 S.Ct. at 2553. Thus, the non-moving party may not rest on its pleading and "must do more than simply 'show there is some metaphysical doubt as to the material facts.'" *Beard v. Whitley County REMC,* 840 F.2d 405, 410 (7th Cir.1988) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

The instant motion for summary judgment challenges Terry's claim that the manner in which he was suspended violated the Fourteenth Amendment, which prohibits a state from depriving "any person of life, liberty, or property, without due process of law." A person who acts "under color of state law" to deprive another of a protected liberty or property interest without due process of law is subject to civil liability. 42 U.S.C. § 1983; *Polenz v. Parrott,* 883 F.2d 551, 555 (7th Cir.1989).

Defendants contend that because Terry's suspension was with pay, it affected no liberty or property interest of his, and that, even if such an interest were affected, any due process requirements were satisfied. Further, it is asserted that Woods is entitled to immunity for his actions in this context.

### I. Terry's Property Interest

Property interests are created and defined not by the due process clause itself, but by independent sources of "rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Thus, the legislation or contracts of a state or local government may create a property interest in public employment. *Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). If such an interest is created, the same sources define its scope. *Id.*

■ Not every property interest, however, is protected under the due process clause. Rather, once such an interest is defined, federal constitutional law determines whether the interest is significant enough to warrant constitutional protection. *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978).

■ Terry says he obtained a property interest in his employment by virtue of his two-year employment contract with RUSD and by virtue of Wisconsin Statute § 118.-24, which requires notice and hearing prior to the nonrenewal of a principal's contract. Defendants do not specifically disagree that these sources create a property interest, and, indeed, the Seventh Circuit Court of Appeals has recognized that a public employee has a property interest in the term of employment set forth in the employee's contract. *Hostrop v. Bd. of Junior College District No. 515,* 471 F.2d 488, 494 (7th Cir.), *cert. den.,* 411 U.S. 967, 93 S.Ct. 2150, 36 L.Ed.2d 688 (1973).

Defendants assert, however, that even if Terry had a property interest in his term of employment, this interest did not entitle him to come to work everyday; it merely entitled him to his status as an RUSD employee and to his paycheck.

The Seventh Circuit Court of Appeals has not squarely addressed this question, but has come close. In *Thornton v. Barnes*, 890 F.2d 1380 (7th Cir.1989), the court held that the board members of a municipal corporation, who had been appointed to serve four-year terms, *might* have property interests in their offices despite the fact that they served without compensation.[1] The court decided that, in addition to compensation, the "demands of a position" and its correspondent "powers and responsibilities" were relevant considerations in determining whether the state had created a property interest in the position. 890 F.2d at 1388. The court noted that "we live, fortunately, in a country where service to one's country and state is not measured simply in terms of financial remuneration." *Id.*

In arriving at its decision, the *Thornton* court partly distinguished and partly declined to follow the Fourth Circuit Court of Appeal's decision in *Royster v. Bd. of Trustees*, 774 F.2d 618 (4th Cir.), *cert. den.*, 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986). The *Royster* court held that a school superintendent, who had been removed prior to the end of his term with full pay and benefits, had no "constitutionally protected property interest in continuing to perform his services."[2] 774 F.2d at 621. *Thornton* seemed to distinguish this holding, first, on the ground that the contract in *Royster* was a contract for employment, whereas the services in *Thornton* were volunteered and, second, on the ground that the plaintiffs in *Thornton* held tenured positions. *Thornton*, 890 F.2d at 1388 n. 9.

This reconciliation notwithstanding, the two cases differ significantly in their respective approaches to determining whether a person may have a property interest in an office. The *Royster* court reached its decision mainly out of a concern that an expanded understanding of property interest would unduly hamper the flexibility of public employers. *Royster*, 774 F.2d at 621. The *Thornton* court, on the other hand, based its decision on the "totality of circumstances" surrounding the plaintiff's appointment and on the " 'substance' of the plaintiffs' rights" as determined by state law, rather than on external policy considerations. *Thornton*, 890 F.2d at 1388 n. 9.

In light of *Thornton*, this court cannot conclude that a public employee could never enjoy a protected property interest in going to work. Rather, the existence of such an interest depends on the totality of circumstances surrounding a given employee's position.

■ Terry's employment contract, the basic source of any property interest he may enjoy as a public employee, states that RUSD "does hereby employ" Terry. Terry agrees to perform his duties in accordance with the rules set by the state and by RUSD. The contract further provides that "in consideration for services rendered," RUSD agrees to pay Terry a biweekly salary, to contribute to a retirement fund on Terry's behalf, and to afford Terry various other benefits, such as vacation time, insurance, and so on. The term of the contract was from July 1, 1989, to June 30, 1991. (Terry Aff. at Ex. A.)

The state statute concerning the employment of school administrators sets procedural requirements for the renewal or non-renewal of a principal's contract. Prior to notice of nonrenewal, a principal must be given preliminary notice of nonrenewal, and has the opportunity for a hearing. Wis.Stat.Ann. § 118.24(7). The statute also provides that a principal

shall perform such administrative and instructional leadership responsibilities as are assigned by the district administrator

---

1. The court did not "decide definitively whether a property right exists" in this context because the case was on appeal from the grant of a preliminary injunction, which only required the court to determine the probability of plaintiffs' success on the merits. *Thornton*, 890 F.2d at 1388, n. 12.

2. The same conclusion has been reached by two other federal courts of appeals. *See: Kinsey v. Salado Indep. School District*, 950 F.2d 988, 997 (5th Cir.), *cert. den.*, — U.S. —, 112 S.Ct. 2275, 119 L.Ed.2d 201 (1992); *Hicks v. City of Watonga*, 942 F.2d 737, 746 n. 4 (10th Cir.1991).

under the rules and regulations of the school board.

Wis.Stat.Ann. § 118.24(3). Further, the statute provides that a principal under contract with any school board may not be employed by another school board. Wis. Stat.Ann. § 118.24(6).

The parties have not described a principal's duties in precise terms. Nevertheless, like the plaintiffs in *Thornton*, Terry says he takes pride in his substantial responsibilities as an administrator. (Terry Aff. at ¶ 15.)

The court concludes that the circumstances surrounding Terry's employment do not indicate that he was "entitled" to go to work. Most importantly, Terry's contract cannot be read as conferring any such entitlement. The consideration flowing to him under the contract is limited to his salary and certain fringe benefits of an economic nature. Although both the contract and state law require Terry to perform certain duties, that requirement does not directly impose any obligation upon RUSD. Terry may have reasonably expected that he would be able to do his work, but an expectation by itself does not create a property interest.[3] *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709.

Thus, on Terry's deprivation of property claim, defendants are entitled to judgment as a matter of law.

## II. Terry's Liberty Interest.

The due process clause protects "liberty interests," as well as property interests. A public employee's liberty interest is implicated when the employer defames the employee in the course of altering some right or status previously enjoyed by the employee. *Paul v. Davis*, 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976). Generally, this liberty interest is found to be impaired only in the context of a firing or a significant demotion. *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136, 1139 (7th Cir.1984).

Terry claims that by suspending him on the basis of the charges set forth in the REA grievance, and by talking to the press about the suspension, defendants impaired Terry's reputation in the community and damaged his opportunities for employment. The allegedly defamatory statements appeared in the Racine Journal Times on May 31, 1990, the day after Terry's suspension.

The article states that Terry was suspended with pay "pending an investigation of a report that he scolded a teacher for calling firefighters after she smelled smoke." Quoting extensively from the REA grievance, the article describes both Terry's alleged scolding of Winters and Terry's alleged policy of requiring all emergency calls to be placed through him. Perhaps the most critical statement contained in the article is the following, in which Winters explains why she called the fire department directly:

> Since we have not had a fire drill since last fall, I am aware that fire safety is not a priority at Janes School and I did not want a disaster on my shoulders.

(Def.'s Mem. at Ex. R.)

For the most part, Woods' reported statements concern the purpose, scope, and expected length of the investigation. In addition, Woods is quoted as saying, "these are serious charges, and we want to deal with them as soon as we can." *Id.* He also told the newspaper that he was not aware that Terry had in fact implemented any policy of the kind described by the REA. *Id.*

Terry says that comments of community members to him and his family indicate that his "reputation in the community was badly damaged" by his suspension. He says that "the community in general seems to feel I must have done something wrong or I wouldn't have been suspended." He also says that although he has not looked for other employment, he is sure that he would not be able to find any, given the damage to his reputation. (Terry Aff. at ¶¶ 16, 17.)

---

**3.** Having determined that Terry did not have a property interest in going to work, it is, of course, unnecessary to determine whether such an interest is entitled to protection under the due process clause.

■ Before considering whether this information is sufficient to raise a genuine issue of fact, the court notes that Terry's suspension with pay might not be enough to justify a finding that a liberty interest of his was impaired. As noted above, the Seventh Circuit has held that "there is no deprivation of liberty if the employee is not fired." *Lawson*, 725 F.2d at 1139. On the other hand, a public employer cannot avoid the due process clause simply by offering the terminated employee an alternative job that is "degradingly inferior" to the employee's previous job. *Id.*

■ Although ultimately Terry was offered a position quite similar to his previous position, it is arguable that his extended suspension was "degradingly inferior" to his work as an administrator. The Seventh Circuit recognized the potentially degrading character of "enforced idleness" in *Parrett v. City of Connersville, Indiana,* where the court described the consequences of a detective's transfer, at no cut in pay, to a position involving literally no responsibilities:

> Enforced idleness was not only a humiliating counterpoint to his years as detective chief but would if prolonged have depreciated his professional skills to the point where it would have been difficult for him to work his way back ... to a responsible position.

737 F.2d 690, 694 (7th Cir.1984). Although in the instant case Terry eventually went back to work, his liberty interests might have been seriously affected during the period of his suspension.

■ The court need not decide that question, however, because it finds that Terry has adduced no statement or action by defendants sufficient to support a conclusion that they seriously damaged his reputation. First, even if a suspension with pay may trigger deprivation of a liberty interest, the suspension by itself does not constitute the deprivation unless it is accompanied by a "publicly announced reason that [impugns the employee's] moral character." *Lawson*, 725 F.2d at 1138. Thus, to the extent Terry is complaining about the effect of his suspension, as opposed to remarks made in connection with the suspension, he cannot prevail on his deprivation of liberty claim.

Second, although the suspension may have lent some legitimacy to the REA's charges, defendants in suspending Terry did not explicitly or implicitly adopt those charges. On the contrary, Woods was careful to avoid choosing sides, and he emphasized the need for a speedy resolution of the dispute due to the seriousness of the charges.

In this respect, the instant case is somewhat similar to *Hadley v. County of Du Page*, 715 F.2d 1238 (7th Cir.), *cert. den.*, 465 U.S. 1006, 104 S.Ct. 1000, 79 L.Ed.2d 232 (1984), a case involving the dismissal of the county's superintendent of public works. A county official had issued a statement that the plaintiff was being dismissed not due to "any pending criminal indictments," but due to the plaintiff's "record of mismanagement." 715 F.2d at 1245–46. The court, affirming a grant of summary judgment for defendants, found that this explanation did not implicate the plaintiff's liberty interest. First, the court held that "a mere charge of mismanagement" or poor performance is not enough; the employer's charge must suggest dishonesty or immorality or something worse on the employee's part. 715 F.2d at 1245.

Second, the court held that the reference to pending indictments, while it might have been misinterpreted as confirming them, was not stigmatizing because the speaker made clear that any such indictments had nothing to do with the employee's dismissal. 715 F.2d at 1246.

Again, in the instant case, Woods distanced himself from the REA's charges. While the suspension indicates Terry may not have been given the benefit of the doubt, it does not indicate that the charges had been verified. On the contrary, Woods said he intended to conduct an investigation into the charges to determine their accuracy. Further, the charges themselves accused Terry of nothing more than mismanagement, which is bad, but not bad enough for the Seventh Circuit.

For these reasons, the court concludes that Terry has not raised a genuine factual

issue as to whether defendants damaged his reputation in such a way as to deprive him of liberty. Thus, on Terry's deprivation of liberty claim, as on his deprivation of property claim, defendants are entitled to judgment as a matter of law.[4]

IT IS THEREFORE ORDERED that defendants' March 20, 1992 motion for partial summary judgment is GRANTED.

---

**4.** Having found no deprivation of liberty or property in this case, the court need not address the questions whether proper procedures were followed and whether Woods is entitled to immunity as to the due process claim.