In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1947

SUSAN ULICHNY,

Plaintiff-Appellant,

v.

MERTON COMMUNITY SCHOOL DISTRICT,
MARK FLYNN, TIMOTHY F. O'NEILL, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 98 C 1144--Rudolph T. Randa, Judge.

Argued November 16, 2000--Decided May 7, 2001


  Before CUDAHY, COFFEY, and EVANS, Circuit Judges.

  COFFEY, Circuit Judge.  On November 23, 1998,
Susan Ulichny filed a complaint in the United
States Federal Court for the Eastern District of
Wisconsin claiming that the Merton Community
School District in Waukesha County, Wisconsin, as
well as the other named defendants, violated her
14th Amendment rights under the United States
Constitution./1 The district court granted
summary judgment to the defendants, holding that
"Ulichny did not have a property interest in
performing the duties normally expected of a
school principal in Wisconsin." The judge also
concluded that

viewing the situation in its entire context as
well as the specific conditions objected to by
Ulichny, . . . no reasonable jury could conclude
that a reasonable person standing in Ulichny's
shoes would have found the working environment so
intolerable as to leave no choice but to quit.
Ulichny was not constructively discharged and was
not deprived of her property interest in public
employment.

The district court judge further concluded that
"no reasonable jury could conclude that Ulichny
was defamed or stigmatized for the purposes of
the 14th Amendment by the statements of any of
the defendants . . . and thus she was not
deprived of her liberty interest in continuing
her career in public school administration."
Finally, the trial judge concluded that even if

there was merit to any of Ulichny's claims, the individual defendants were entitled to qualified immunity./2 We affirm.

I.   BACKGROUND

A.   The Contract

In August 1995, the Merton Community School District (MCSD) hired Susan Ulichny as the District Principal with a contract for the 1995-96 school year. As with all contracts of this nature, Wisconsin Statute sec. 118.24 requires a principal's contract to be automatically renewed for a subsequent term unless MCSD issues a notice of non-renewal to the principal at least four months prior to the contract's expiration date./3 Absent non-renewal, a principal's contract can be terminated only by mutual consent of all the parties involved or if, after notice and a hearing, "just cause" existed for the principal's removal.

Under the "RESPONSIBILITIES" section of the contract between Ulichny and MCSD, Ulichny was to

perform at a professional level of competence the services, duties and obligations required by the laws of the State of Wisconsin and the rules, regulations and policies of the Board which are now existing or which may be hereinafter enacted by the Board.

[and]

. . . to devote full time to the duties and responsibilities normally expected of the Principal's position during the term of this contract, and shall not engage in any pursuit which interferes with the proper discharge of such duties and responsibilities.

The School Board, in turn, had the responsibility "to furnish [Ulichny] with a written copy of all . . . rules, regulations and policies now in effect or becoming effective during the term of this contract," and to further "provide [Ulichny] with a written job description of the services, duties and obligations" of the Principal position.

B.   Ulichny's First Year

When Ulichny was hired in August of 1995, Bruce Connolly was the District Administrator for MCSD and Ulichny was initially assigned to serve as the K-8 Principal for the 730 students of the Merton School. However, shortly after Ulichny was hired, a new school building was opened and the Merton School was separated into two

buildings/schools, K-5 (Elementary School) and 6-8 (Intermediate School).

As is the normal procedure for School Administrators, Connolly formally evaluated Ulichny's performance as principal during her first year. After reviewing the comments of teachers and staff,/4 Connolly issued a formal, written evaluation of Ulichny's first-year performance on September 23, 1996. Connolly concluded that:

This evaluator has worked in supervising numerous principals over the course of the past 20 years. I would not characterize Mrs. Ulichny's first year as a completely successful one. While she faced many issues and problems and dealt successfully with most, some of the negatives outweighed the positives. I hope that Mrs. Ulichny takes to heart the recommendations and suggestions made in the body of the evaluation to work on her interpersonal relationships with parents and staff. I also hope she works on issues surrounding power and control. I genuinely believe that if she would practice a less judgmental style and use less positional authority and power, she will be successful. I expect Mrs. Ulichny to draft a plan for improvement in each of the areas where recommendations were shared. This plan for improvement should be in writing. Together, we will then draft a plan for improvement and measurable outcomes for the 1996-1997 school year. It would be my desire and hope that this plan for improvement would mediate many of the issues and concerns that occurred during the first year. Since I will be leaving as of October 1st, I would encourage the hiring of an independent evaluator to judge the process toward the completion of established goals.

However, before any plan could be implemented to improve Ulichny's performance as a principal, Connolly resigned his position as District Administrator. Approximately four weeks thereafter, Connolly was temporarily replaced by Michael Budisch, who served as Interim District Administrator.

C. Ulichny's Second Year/5

Staff and teacher evaluations of Ulichny's second year also produced varying opinions of Ulichny's performance as principal; some believed Ulichny to be doing an excellent job while others felt equally as strongly that Ulichny was not performing well. Although Budisch did not issue a formal, written evaluation of Ulichny, he did inform Ulichny, via a letter, that the School Board, based primarily on the negative comments

of some of the teachers and staff, had issued a preliminary notice of non-renewal on January 31, 1997. Budisch's letter to Ulichny informed her that the Board was considering the non-renewal of her contract and that she was entitled to a hearing before a final decision was made. She requested a hearing and it was scheduled for February 26, 1997.

At the private hearing before the School Board, Ulichny presented the testimony of several supportive staff members and teachers who spoke at length concerning the criticisms that had been leveled against her. Much of the discussion focused on criticisms alleging a negative "school climate," "strained relationships," and/or poor communication between Ulichny and some members of the staff and teachers.

After the hearing, the School Board notified Ulichny on March 7, 1997, that it was not renewing her contract. Despite this decision, the Board did offer her a one-year contract for the 1997-98 school year as the Merton Intermediate School Principal (Grades 6-8), and Ulichny accepted the position.

After Ulichny's acceptance of the offer, the Board issued a written evaluation of her performance during the 1996-97 school year. The Board concluded, consistent with the criticisms leveled against Ulichny by certain members of the staff and teachers, that "Ms. Ulichny's leadership skills need a great deal of improvement" and also "that a large group [of faculty and staff] lacks confidence in her abilities as a principal." The School Board cited "school improvement, school climate, leadership, and interpersonal relationships" as the areas where there was "a significant need for improvement on Ms. Ulichny's behalf." The Board suggested that Ulichny "register for classes and workshops" to help her improve in those areas and stated its "expectation . . . that there will be measurable and significant improvement" in her performance. The Board also directed that Ulichny agree to a formal "plan of assistance" that included "a process of continuous evaluation and feedback on the areas previously noted" and "goals and steps to accomplish these goals."

D.  Ulichny's Third Year and the Wedgie Incident

On July 1, 1997, Mark Flynn replaced Budisch as the District Administrator. Immediately after Flynn assumed the District Administrator position, he prepared a formal assistance plan for Ulichny, dated August 7, 1997, which identified four areas for improvement--school climate, leadership skills, interpersonal skills,

and communication skills. Additionally, Flynn set goals and actions for Ulichny to perform, and set a timeline in which he expected these goals and actions to be accomplished. Flynn's plan required weekly meetings between Flynn and Ulichny in order that he might monitor her progress in team building skills and healthy communication. Additionally, Flynn was supposed to prepare quarterly written progress reports evaluating Ulichny's performance and development in order that Ulichny could continue to improve as a principal and the Board could monitor that improvement.

On October 14, 1997, before Flynn prepared any of the quarterly progress reports, approximately six 7th and 8th grade students physically and violently assaulted another boy on the playground: code named "a wedgie." According to the district court's findings,

this was not a quick "grab and release" wedgie, a childhood prank between friends that even the Court remembers. This particular "wedgie" was of a very aggressive variety, i.e., there were 5-6 kids against 1, they forced their victim to the ground, they pulled so hard on his underwear that he was lifted into the air and dropped back to the ground, and his underwear tore in two places. The victim ran away crying. In short, this was not playful behavior between friends; it was a mean-spirited act of cruelty intended to humiliate the child at issue.

(Emphasis added).

Before deciding on any course of action, Ulichny called District Administrator Flynn and informed him of the "wedgie" incident and she proposed calling the sheriff's department. Flynn agreed with Ulichny's suggestion and Ulichny called Deputy Haizel, the school's D.A.R.E. officer./6

Once at the scene, Deputy Haizel spoke with Ulichny, the students involved in the incident, and some of the students' parents. After his investigation, Deputy Haizel issued each of the students who had given the boy a wedgie a citation for disorderly conduct./7 After the deputy issued the citations, Ulichny notified the parents of the students involved in the incident, relayed the fact that the police had been called, and advised them about the issuance of disorderly conduct citations./8

E. Fallout from the Wedgie Incident

The "wedgie" incident garnered a great deal of attention. Local newspaper stories reported

details of the incident, including the fact that some of the parents felt that Ulichny had responded inappropriately and in too harsh a manner when calling the police. A petition was circulated in the community requesting an independent investigation into the handling of the incident.

Although there were obviously members of the community who felt Ulichny had mishandled the matter, there were also a significant portion of the community who supported Ulichny's actions. In fact, Flynn, who had approved Ulichny's decision to call the police, publicly supported Ulichny's actions. Also, Waukesha County Sheriff's Captain Thomas Lentz was quoted as saying, "[w]hen the school requested our assistance, we responded, and it is my presumption the incident had gone beyond what was tolerable within the school." Colleen Krantz and Linda Spice, Suspensions for 'Wedgie' Upset Students' Parents Citations in Merton Middle School Incident Could Cost 6 Boys $141, Milwaukee Journal Sentinel, October 25, 1997.

On November 6, 1997, while some members of the community were still complaining about Ulichny's handling of the "wedgie" incident, Flynn issued Ulichny's first quarterly progress report. Flynn, who had approved Ulichny's proposal to call the police to the school after the wedgie incident, concluded that Ulichny "has demonstrated good performance in her role as Principal" and noted "her willingness, with results, to actively participate in the improvement process thrust upon her by the Board and the Superintendent." Furthermore, the School District had an outside consultant conduct a staff survey during the month of December, 1997. The survey report stated that there was an "improvement in the relationship between Ms. Ulichny and the professional teaching staff" and noted that, while "some distrust remain[ed]," it was "on a subdued level since the 1996-97 school year."

On December 12, 1997, Flynn gave Ulichny her second quarterly progress report. In the second report, Flynn concluded that "Susan continues to improve as a principal. . . . Her improvement orientation, her introspection, are exemplary." Three days after this report, and in an effort to assist the Board in making its decision regarding the possible renewal of Ulichny's contract, Flynn submitted a confidential report to the School Board regarding Ulichny's contract status and the progress of her assistance plan. The report listed specific areas of strength, areas of improvement, and areas for future growth. Furthermore, Flynn recommended that Ulichny receive a renewed contract for two years. According to Flynn,

Mrs. Ulichny has earned a 2 year contract. My impression was that I started with a first year principal. Improvement has been substantial and her improvement orientation will continue to help her improve. Her performance has been good this year, she has the potential to improve and has served the district well.

. . . Many times there currently exists with the employees and the community a propensity to make Susan the issue, instead of children being the issue. The support of a 2 year contract reduces that propensity.

At this time, Flynn was aware of the propensity among school employees and community members to make Ulichny the scapegoat for many of the problems. Flynn further recognized that if the Board showed its support for Ulichny, in the form of a two-year contract, the unwarranted finger-pointing at Ulichny might be reduced. On December 15th, the Board, in a closed session, voted to issue a two-year contract to Ulichny covering the 1998-99 and 1999-2000 school years.

F.  The Board Remains Supportive

   During a January 20, 1998 Board meeting, some 90 days after the wedgie incident, Ulichny's handling of the matter was again raised; some of the parents still criticized Ulichny's actions while others spoke out in support of her exercise of judgment. Like before, Flynn spoke in strong support of Ulichny's actions, stating that "Susan . . . had my 100 percent support . . . [a]nd has it to this day."

   Like a dog gnawing on a bone, some parents still could not let go of Ulichny's handling of the wedgie incident. When Jeffrey Musche, a parent of a child in the School District, learned that the Board had voted to extend Ulichny a two-year contract, he complained (apparently to the police) that the Board violated Wisconsin's Open Meetings Law, Wis. Stat. sec. 19.81 et seq. (1999), by not informing the public or voting in open session regarding Ulichny's contract renewal. After Flynn discussed the closed-session vote with Waukesha County District Attorney Paul Bucher (to whom Musche's complaint was forwarded and who concluded that the closed-session vote was illegal), the Board met on February 16, 1998, and voted to rescind the prior vote on Ulichny's contract.

   After a group of parents voiced their objections to the renewal of Ulichny's contract at the February 16, 1998 Board meeting, the Board delayed a second vote on Ulichny's contract. It

should be noted that parents at the meeting also took issue with Flynn's evaluations of Ulichny and now added to their complaints alleged teacher morale problems, teacher turnover, student achievement, an unsettled teachers' contract, and delayed textbooks. As noted by the district court, newspaper reports following the meeting attributed the following position to Flynn concerning Ulichny and/or the other issues raised:

Superintendent Mark Flynn had completed Ulichny's evaluation. He has steadfastly upheld her decision to call law enforcement to the school.

* * * * * *

[Flynn] went on to say that he shared some of the concerns raised by the residents, including: teacher morale, lack of trust, the public's regard for the administration, an unsettled teachers' contract, teachers' regard for the board and teacher turnover.

[Flynn] said there is a misperception as to why some teachers have left the district. The reasons are stated in correspondence the district has received from the teachers. He did not elaborate on the reasons. Flynn also addressed concerns that had been raised about textbooks, students' placement at Arrowhead High School and curriculum. . . . [Flynn] added he is looking at providing time for teachers to talk to each other about educational strategies . . . .

Asked about parents' complaints, Superintendent Mark Flynn said: "I'm not going to substantiate or deny them. It was these parents' opportunity to state their perceptions and that's what they did." Parents of the youths said administrators overreacted by calling police. But Flynn said the district acted appropriately.

[Emphasis added].

   The newspaper articles also quoted School Board President Isabel Brown as stating that, although numerous parents who attended the meeting wanted Ulichny removed, we probably "have more people who want her to stay than want her out." [Emphasis added].

G. School Administrators and the Board Abandon Ulichny

   The Board met in open session on February 19, 1998, to again discuss whether to renew Ulichny's contract. However, the deadline for providing Ulichny with a preliminary notice of non-renewal under Wis. Stat. sec. 118.24 had passed and the

Board was thus obligated to renew Ulichny's contract. Instead of merely renewing Ulichny's contract for a year, the Board voted "to continue Susan Ulichny's employment with the Merton Community School District with a revised job title and description beginning with the 1998-99 school year." On February 20, 1998, Flynn sent a memo to all school district employees stating,/9 in part:

The school board was advised by legal counsel of the fact that statutory timelines provided for the renewal of the employment contract for Ms. Ulichny whether the board acted or not. Given that advice, the board acted to continue Ms. Ulichny's employment contract with the Merton Community School District for the next 2 years with a revised job title and description, beginning with the 98-99 school year.

The board, after lengthy discussion, took this action in response to: contractual obligations, statutory requirements, staff input, board input, parent input, and taxpayer interest. The board, in the coming months, will approve revised job duties for administrative staff that are responsive to the input received from staff and parents.

Newspaper articles quoted Brown and Flynn as follows:

[Ulichny's] new duties likely will include some of the areas [she] now handles, such as curriculum and technology, Brown said.

"She will be the principal for the balance of this year," Brown said. "We're hoping that the rest of the year goes well . . . . We will be working with Susan and the staff to see where her abilities fit in best."

* * * * * *

Superintendent Mark Flynn said Friday that he understands parents remain upset about the contract extension. But he said the board's decision took into account both negative and positive comments the district received about Ulichny, the district's contractual obligations, a responsibility to taxpayers, and Ulichny's 2 years of employment in Merton Schools.

"When the job responsibilities are finalized, I think people will be able to readily see the board is responding in the best interests of the children of Merton schools," Flynn said. "This is the start of a process of change."

However, an April 21, 1998, Milwaukee Journal

Sentinel article reported that the Board "could strip [Ulichny] of her duties as principal at the end of the school year" and quoted Board President Brown as stating that Ulichny's revised job duties "could lead to her not being principal." The Lake Country Reporter stated that although Ulichny would be allowed to stay on at the Merton Intermediate School for at least two more years, "she may no longer be principal of the school." The article went on to state that

"There will be some shifting of job responsibilities," said superintendent Mark Flynn. "She could feasibly not be the principal of Merton Intermediate School."

* * * * * *

"I'm confident we can put together a plan that will work for the children and be responsive to their needs," said Flynn, adding that the Board was trying to accommodate the needs of everybody involved.

"The board feels that the plan is responsive to the concerns of the board, staff and parents," he said. "The division of duties is something that will reflect the concerns that the community and staff indicated they wanted."

Flynn said neither he nor the board had decided on any specific changes to Ulichny's job description.

* * * * * *

Throughout the controversy, Flynn and the school board have stood behind their principal, but at a raucous meeting last week a number of parents spoke out criticizing [Ulichny's] conduct and asking for her dismissal.

* * * * * *

[Flynn] did not describe the board as having been "forced" to keep Ulichny on, but did say that "the time had passed" when the board could have asked her to leave.

Despite the fact that newspaper articles were regularly appearing which quoted school administrators as questioning Ulichny's role as school principal (it is most interesting to note that these supposed concerns did not exist just two months earlier when the Board voted to extend Ulichny's contract for two years), Ulichny accepted her 1998-2000 contract on March 25, 1998. However, when Flynn asked Ulichny to assist him in drafting her revised job duties, she refused. This, in our opinion, was a matter of

poor judgment on the part of Ulichny because she passed up the opportunity to put her input in the now-inevitable changes. In spite of the fact that Ulichny stated that she felt she was capable of performing all the current duties of her position, Flynn drafted, without Ulichny's input, the proposed changes and provided her with a copy of the "proposed job description and title changes" just 72 hours before the new job description was to be presented at the April 20, 1998, School Board meeting.

In his plan, Flynn recommended that he become the Intermediate School Principal in addition to being the District Administrator. Mike Budisch, who was previously the K-3 Primary School Principal, would serve as the K-5 Principal. Ulichny would assist Flynn in the administration of the Intermediate School, while retaining her salary and the title of School Principal. However, she was divested of the specific authority to perform many of the duties which she had previously performed, such as the direct supervision of employees and student discipline.

Upon receipt of the new job description, Ulichny's attorney wrote a letter to the School Board and stated that the proposed changes violated: 1) her contract; 2) Wisconsin law; and 3) her federal due process rights. Ulichny's attorney also claimed that if the School Board considered Flynn's proposed changes in an open session or released the proposed changes to the public, the School Board would be violating Ulichny's "due process and/or liberty interest" rights in her reputation.

The Board saw fit not to respond to this letter and held the April 20, 1998, meeting in open session (reporters and several community members were in attendance). At the meeting, Flynn's proposed changes were "briefly discussed." The Board did not vote on the proposed changes, but scheduled a meeting for May 18, 1998, to vote on the proposed job changes. However, prior to the meeting, Ulichny served a "Notice of Claim and Claim on the Clerk of the Merton School Board," which reasserted the claims made in her attorney's letter to the Board. In response to the Notice, the Board removed the scheduled vote on the proposed job changes from its formal Agenda for the May 18th meeting. Instead, the Board held a closed session meeting "to confer with legal counsel and receive advice concerning strategy to be adopted with respect to litigation which is likely to occur."

After Ulichny sent the Notice, Flynn began sending memos to Ulichny criticizing various perceived lapses in her performance./10

Additionally, Flynn failed to prepare and file the March 1 and June 15 quarterly progress reports despite the fact that they were set forth in the assistance plan put in place when Ulichny was re-hired for the 1997-98 school year. It is important to note that Ulichny did not recall ever receiving such critical memos from Flynn in the past. It is also important to note that Ulichny's previous two performance reviews (before her job duties were revised) had been very positive.

Despite Flynn's either contrived or careless failure to prepare and file the remaining quarterly progress reports, he did prepare a year-end evaluation of Ulichny's performance on July 7, 1998. In the evaluation which he never discussed with Ulichny, Flynn radically and not surprisingly altered his evaluation of Ulichny and cited regression in many "critical areas" since Ulichny's first two quarterly progress reports. Flynn further concluded that Ulichny's performance "if not reversed, will result in a short-term, unsuccessful employment relationship with the Merton Community Schools." It should be noted that even at this time newspaper reports were still reflecting a divided community. For example, an article in the Milwaukee Journal Sentinel stated:

Those who wrote in favor of Ulichny said she is the victim of a vocal minority that is manipulating the School Board.

Parents Greg and Lisa Overholt wrote to the board saying Ulichny is "a very professional and caring person."

"Unfortunately, as part of our human nature, you will hear more often and more loudly the voices of discontent. . . . We urge you to understand that those who are complaining speak for themselves only and do not speak for the community as a whole," the Overholts wrote.

A school counselor, P.J. Sanders, wrote to the board that Ulichny had turned a "turbulent atmosphere" at the school into a "sense of calm, a sense of orderliness."

Even the Delafield police chief weighed in on the matter, although he doesn't live in the district.

"I believe Principal Ulichny acted appropriately when she notified the Sheriff's Dept. about the 'wedgie' incident; and while I do not think the police should be called for every shoving match or disruptive act a student might get involved in, I think it very likely that school administrators do not call the police as often as

they should," Chief Jack Arndt wrote.

Letters against Ulichny were equally passionate.

"Morale of teachers, staff and students is the lowest I've seen in the last eight years. . . . Our curriculum leaves a lot to be desired," parent Sandy Wegner wrote to the board. "We have lost some of the best teachers we ever had because of their problems with Mrs. Ulichny." Wrote Russell and Cindy Hauser: "There is an overwhelming feeling in this community that our intermediate school is in disarray and that is a direct reflection of the problems with our principal." One parent, whose name was censored from the letter by district officials, said Ulichny, by calling police in the playground incident, "stripped the parents of the right to discipline their own children."

Mike Johnson, MERTON SCHOOLS 'Wedgie' Incident Shows Rift in Community Parents Take Sides Over Principal's Performance, Milwaukee Journal Sentinel, March 19, 1998.

On August 3, 1998, Flynn sent Ulichny a memo and stated that "[c]oncrete changes" were going to take effect in the upcoming 1998-99 school year. The changes were as follows:

Under the category of "Visibility/Supervision," Ulichny was required to be on the playground for a half hour before school, in the lunch room and on the playground for all three lunch periods of the Intermediate School, in the halls when the 7th and 8th graders changed classes, and in the halls and outside school during school dismissal and bus departure.

Under "Employee Supervision," Flynn was responsible for the supervision and evaluation of all teachers and Ulichny would only "assist with scheduling issues" and would be "assigned specific teacher evaluations . . . [to] participate in."

Under "Student Discipline," Ulichny would handle student discipline in grades 4-6, while Flynn would handle discipline in grades 7-8 "and all suspension/law enforcement situations."

Under "School/Community Newsletter," Ulichny and Flynn would work together to "set a schedule and contents" for the school newsletter.

Under "NCA and Curriculum Evaluation," Ulichny would "provide the administrative leadership in these 2 areas."

Under "Intermediate Advisory Council," Flynn

would work directly with the advisory council, and Ulichny "may participate if [Flynn] deem[ed] it appropriate, but not in the beginning."

Under "Support," Ulichny was "expected to support and carry out in spirit and letter, the positions, policies, and directions of the school board and superintendent . . . [a]greement with the decision is not relevant."

On August 5, 1998, Flynn and Ulichny (along with their respective counsel) met to discuss the changes in her job responsibilities. According to Flynn's notes, he and/or district counsel raised issues concerning Ulichny's job performance, including her failure to progress in inspiring trust, lack of attendance at special events, lack of judgment, and noncompliance with directives. Flynn also elaborated on some of the responsibilities he would be assuming in light of Ulichny's new job description. For example, in the area of "Student Discipline," Flynn stated that he would assume a "mentoring role on a temporary basis in grades 7-8" and that Ulichny would handle grades 4-6 "except special education and suspensions." Flynn described his "mentoring role" as one in which he would, at his sole discretion, "handl[e] some cases, others handled as a team, others with consultation, and some delegated to [Ulichny]." Additionally, in the area of "Employee Supervision," Flynn also stated that he would assume a "mentoring role" concerning "the supervision of all employees at the Intermediate School, for day-to-day purposes as well as evaluation purposes." Flynn described his "mentoring role" as one in which he, again at his sole discretion, "exclusively handl[ed] some matters/cases, others handled as a team, others with consultation and some delegated to [Ulichny]." Flynn explained that these changes "were being taken because the building and its morale were viewed to be in crisis, and some modeling or teaching for [Ulichny] was needed in light of the situation after [her] three years in the district." Possibly the new description was a last attempt by Flynn to save his own position from a politically biased School Board.

At the beginning of the 1998-99 school year, Flynn moved his office into the Intermediate School and was directly across the hall from Ulichny's office. Furthermore, in spite of the fact that Flynn approved and supported (as did the Board) Ulichny's decision to notify the police after the violent assault by the six children perpetrated on one single child, Flynn presided over the first faculty meeting and informed the teachers and staff that he would be handling all discipline at the Intermediate School and that he would perform all teacher

supervision and evaluations. A subsequent memo to school staff informed them that they could contact either Flynn or Ulichny with questions or concerns, but stated that Flynn was their "direct supervisor." Additionally, Flynn hired a teacher for the school without conferring with Ulichny. He also conducted staff meetings without informing Ulichny of the meetings or what had transpired at them. Flynn also dealt with staff, parents, and students regarding day-to-day issues at the school and Ulichny had to refer questions from parents or staff to him.

On September 10, 1998, Ulichny asked Flynn whether the current division of responsibilities would continue indefinitely and Flynn responded that they would. After Ulichny called in sick the next day, Flynn ordered her to provide a doctor's note. The note Ulichny provided advised Flynn that Ulichny was suffering from an unspecified "medical illness" and that she was "to remain off work until [her] condition is improved."/11

On September 30, 1998, Flynn sent Ulichny forms to apply for a medical leave of absence. However, Ulichny responded that she was not requesting leave under the Family Medical Leave Act. On October 19, 1998, Ulichny's lawyer sent a letter to the School District claiming that Ulichny had been constructively terminated because her main duties had been taken away and her job was, therefore, unbearable.

Ulichny, at this time, filed a complaint in the United Stated Federal Court for the Eastern District of Wisconsin alleging that the School District and the various other defendants had violated her due process rights when they altered her job responsibilities./12 As mentioned before, the district court granted summary judgment to the defendants because, based on the law according to the trial judge, Ulichny did not have a property interest in her job as school principal and she was not constructively discharged. The district court judge further concluded that according to case law "she was not deprived of her liberty interest in continuing her career in public school administration." Finally, the judge concluded that even if there was merit to Ulichny's claims, the individual defendants were entitled to qualified immunity. Ulichny appeals.

II.  ANALYSIS

A.  Standard of Review

We review the trial judge's conclusions of law and decision to grant summary judgment de novo. Wright v. Illinois Dep't of Corrections, 204 F.3d

727, 729 (7th Cir. 2000); Freedom From Religion Found., Inc. v. City of Marshfield, 203 F.3d 487, 490 (7th Cir. 2000). We must keep in mind that summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In determining whether a genuine issue of material fact exists, we must review the record in the light most favorable to the plaintiff and make all reasonable inferences in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

B.  Property Right

  Ulichny's federal constitutional claim depends on her having had a property right in continued employment as the school principal. Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985); Board of Regents v. Roth, 408 U.S. 564, 576-78 (1972); Reagan v. United States, 182 U.S. 419, 425 (1901). If Ulichny does have a such a right in her position as school principal, the School Board could not terminate her without due process. Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 11-12 (1978); Goss v. Lopez, 419 U.S. 565, 573-74 (1975). In evaluating Ulichny's claim on appeal, it is important to understand that property interests are not created by the United States Constitution. "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Roth, 408 U.S. at 577; see also Paul v. Davis, 424 U.S. 693, 709 (1976). Accordingly, federal property interests under the 14th Amendment usually arise from rights created by state statutes, state or municipal regulations or ordinances, and contracts with public entities. Furthermore, "property interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, property denotes a broad range of interests that are secured by existing rules or understandings." Perry v. Sindermann, 408 U.S. 593, 601 (1972) (internal citations and quotations omitted). Finally, a property right "may be supplemented by other agreements implied from the promisor's words and conduct in the light of the surrounding circumstances." Id. at 602 (internal citations and quotations omitted).

  On appeal, Ulichny argues that her

contract and Wisconsin law establish her federal

property interest in performing the primary duties of School Principal. This is so because [her] contract provided that the District employed her "in the position of School Principal" and because Wisconsin case law recognizes that if an employer refuses to allow an employee to perform the primary duties agreed upon, the employer has discharged the employee. Ulichny further argues that while the Board had the right to assign her additional duties, it did not have the right to "take away the primary duties of [her] position."

Two provisions of Ulichny's contract cover the duties/ responsibilities she was to have. The first provision obligated Ulichny "to devote full time to the duties and responsibilities normally expected of the Principal's position during the term of this contract . . . ." (Emphasis added). The second provision required that she "perform at a professional level of competence the services, duties and obligations required by the laws of the State of Wisconsin and the rules, regulations and policies of the Board . . . ." With regard to Wisconsin statutes, Wisconsin state law requires that "[t]he principal . . . perform such administrative and instructional leadership responsibilities as are assigned by the district administrator under the rules and regulations of the school board." Wis. Stat. Ann. sec. 118.24(3).

The district court concluded that

the Wisconsin statutes do not support the existence of a principal's property interest in performing specific duties. Neither does the contract's reference to "the duties and responsibilities normally expected of the Principal's position . . . ." This provision, placed within the "RESPONSIBILITIES" section of the statute, simply sets forth what Ulichny's obligations were under the contract. It does not place a reciprocal obligation on the Board or prevent it--or the district administrator acting with the Board's authority--from determining what the precise nature of Ulichny's duties would be.

In Terry v. Woods, 803 F. Supp. 1519 (E.D. Wisconsin 1992), the federal court in the Eastern District of Wisconsin was asked to address a very similar factual case. In Terry, the

employment contract, the basic source of any property interest [the plaintiff] may enjoy as a public employee, states that RUSD [Racine Unified School District] "does hereby employ" Terry. Terry agrees to perform his duties in accordance with the rules set by the state and by RUSD. The contract further provides that "in consideration for services rendered," RUSD agrees to pay Terry

a biweekly salary, to contribute to a retirement fund on Terry's behalf, and to afford Terry various other benefits, such as vacation time, insurance, and so on. The term of the contract was from July 1, 1989, to June 30, 1991. (Terry Aff. at Ex. A.)

The state statute concerning the employment of school administrators sets procedural requirements for the renewal or nonrenewal of a principal's contract. Prior to notice of nonrenewal, a principal must be given preliminary notice of nonrenewal, and has the opportunity for a hearing. Wis.Stat.Ann. sec. 118.24(7). The statute also provides that a principal

shall perform such administrative and instructional leadership responsibilities as are assigned by the district administrator under the rules and regulations of the school board.

Wis.Stat.Ann. sec. 118.24(3). Further, the statute provides that a principal under contract with any school board may not be employed by another school board. Wis.Stat.Ann. sec. 118.24(6).

The parties have not described a principal's duties in precise terms. Nevertheless, like the plaintiffs in Thornton, Terry says he takes pride in his substantial responsibilities as an administrator. (Terry Aff. at para. 15.)

Id. at 1523-24. Under this very similar factual situation the trial judge went on to hold

that the circumstances surrounding Terry's employment do not indicate that he was "entitled" to go to work. Most importantly, Terry's contract cannot be read as conferring any such entitlement. The consideration flowing to him under the contract is limited to his salary and certain fringe benefits of an economic nature. Although both the contract and state law require Terry to perform certain duties, that requirement does not directly impose any obligation upon RUSD. Terry may have reasonably expected that he would be able to do his work, but an expectation by itself does not create a property interest. Roth, 408 U.S. at 577, 92 S. Ct. at 2709.

Id. at 1524 (footnote omitted).

In Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524 (7th Cir. 2000), a case decided the day before oral argument in this case, this court also addressed the property rights a school principal has in his or her job. In fact, in Bordelon, the school district not only took away the "main" duties of the school principal but also transferred the principal to

an administrative position in the Central Office. Id. at 530. In Bordelon, this court held that the school board was entitled to summary judgment on the plaintiff's claim for deprivation of his property interest because he failed to offer any evidence of economic harm as a result of the Board's conduct. Id. at 531.

However, in this case, Ulichny was not transferred to another official position or location. In fact, she retained her title as principal and was paid the same wage. Ulichny attempts to support her position by pointing to amorphous phrases like "duties and responsibilities normally expected of the Principal's position."/13 However, in Roth, 408 U.S. at 577, the Supreme Court held that "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." (Emphasis added). We can, of course, understand Ulichny's desire to perform the duties that she reasonably believed constituted the position of school principal. However, the fact that Ulichny could very well have reasonably believed that she should be able to perform certain duties as principal, this expectation without more (either in the caselaw, the job description, the contract, or Wisconsin statutes) does not rise to the level of a protectable property right under the United States Constitution because, under the terms of the contract and Wisconsin law, she does not "have a legitimate claim of entitlement to it." Id.

For example, in Ulichny's appellate brief she lists the following six duties she lost: 1) enforce discipline; 2) participate in the recruiting, screening, hiring, training, assigning, and evaluation of professional and support staff persons assigned to the school; 3) evaluate and counsel all staff members; 4) conduct staff meetings; 5) recommend to the district administrator whether or not to remove or discipline a staff member; and 6) delegate authority. However, the right to perform any one of these specific duties is neither enumerated in Ulichny's employment contract nor in any Wisconsin state statutes. Consequently, relying on federal and state law as we must, we are bound to conclude that Ulichny does not have a recognized property interest in performing particular duties as a principal. This is not to say that we are unsympathetic to Ulichny's claim and we believe she was the victim of a politically-motivated School Board who failed to support a school principal who not only acted in the best interest of the children but also in the

best interest of the school, especially in this day of ever increasing school violence and litigation. However, "not all torts or contract breaches committed by government entities are constitutional or civil rights violations with redress in federal court." Bordelon, 233 F.3d at 531./14

C.  Constructive Discharge/15

   Ulichny also argues that she was constructively discharged when the Board and the District Administrator revised her job duties and thus made her working conditions so intolerable that she was compelled to quit.

   In support of her claim of constructive discharge, Ulichny cites a litany of developments and actions that allegedly created an intolerable working environment. In her brief to this court, Ulichny identifies six actions which support her constructive discharge claim:

Flynn moved his office into the Intermediate School directly across from Ulichny's office and took control of the school.

Over Ulichny's objection, Defendants used an overhead projector to graphically display to the public that Ulichny would have supervisory duties over no one.

Flynn assigned Ulichny the duties of a $10-per-hour aide for almost four hours every day.

Flynn told Ulichny on at least two occasions that she should get another job.

Ulichny had less authority than her staff with respect to the discipline of students.

Defendants never informed Ulichny why they stripped her of the main duties of School Principal.

As the district court aptly noted,

[w]hat is clear from the foregoing litany of complaints, and from the record as set forth in the factual section, supra, is that the political fallout from the handling of the "wedgie" incident brought substantial pressures to bear in the Merton Community School District and caused a substantial amount of stress and humiliation for both Ulichny, Flynn, the Board and the School District as a whole. It is also clear that the political fallout was something that neither Ulichny nor the School District could control; the story assumed a course and life of its own through the efforts of several disgruntled

parents and an energized media (both locally and nationally). It is finally clear that the Board-- after perhaps underestimating the shelf-life and/or magnitude of the situation, and when forced to consider the issue of Ulichny's job renewal in an open session with public input-- quickly surmised that the political situation required action to quell the storm. The action it took . . . was to make Flynn the direct principal of Merton Intermediate School and to revise Ulichny's job duties such that she was essentially an assistant principal with reduced responsibilities (at least initially) acting on Flynn's direction and guidance. Perhaps this was unfair or even cowardly (considering the undisputed strides Ulichny had made prior to and for some time after the "wedgie" incident), and certainly it was a setback for Ulichny . . . .

In support for her claim that she was constructively discharged, Ulichny cites to Parrett v. City of Connersville, 737 F.2d 690 (7th Cir. 1984). However, we are of the opinion that Parrett provides no support for Ulichny. In Parrett, a former chief of detectives was removed and demoted and "given a windowless room to sit in that formerly had been a storage closet. The room had a desk and chair but no other furniture and no telephone." Id. at 603. Additionally, Parrett spent his entire shift sitting at the desk with nothing to do. Id. We are of the opinion that Ulichny's situation certainly was far removed from the extreme situation in Parrett and that her assignment did not rise to the level of warranting a resignation as the only alternative to avoiding or overcoming an intolerable situation.

For example, she retained her same title and pay as principal, and more importantly, she continued to perform some but not all of the duties and responsibilities usually assigned to a principal. Ulichny cannot argue that she was subjected to "enforced idleness" and/or faced the distinct possibility that her professional skills as a principal would substantially depreciate. While it is undisputed that Ulichny lost direct responsibility for some of the more significant or traditional duties of a principal, she did have a role in the administration of the school and did, as described above, retain some responsibilities and duties, unlike Parrett.

Rather than the circumstances being objectively intolerable as required under the constructive discharge doctrine, we are of the opinion Ulichny must have believed that any changes in her duties were unacceptable. This is evidenced by her refusal to even participate or assist Flynn in restructuring her job responsibilities, taking

the position that no changes were necessary and thus suggesting that any change was unacceptable. Not only is this position not objectively reasonable, but it is important to note that Ulichny passed up the opportunity to have input and some possible influence concerning what changes to her responsibilities would be made.

It is also possible that the Board gave Ulichny different responsibilities in the hopes that "sooner or later" she would quit. However, the fact that Ulichny endured the changes for a short span of only three weeks truly undermines her constructive discharge claim./16 The duties to which she was assigned, although clearly beneath her level of experience and accomplishment, are not totally unexpected of teachers and administrators. We certainly understand her frustration at the Board's as well as District Administrator Flynn's abandonment of her, but under the law she should have given the new regime more time before quitting. To hold otherwise would be to take the "objectively unreasonable" requirement out of the constructive discharge doctrine and place a premium on the intent of the employer.

We are of the opinion that Ulichny's act of resignation was not the only means to avoid objectively miserable working conditions. Rather, it appears she was of the opinion that the School Board was handling criticism of her, including the "wedgie" incident, improperly and that any changes in her contract were unnecessary. Although her beliefs might very well have been reasonable, the fact that the politically active Board chose to go another way (even unreasonably) does not make her working conditions so intolerable that she was constructively discharged.

D.  Liberty Interest

Ulichny also claims that the defendants violated her federal liberty interests by publicly making false statements that she was untrustworthy and should not be around children. She also claims that her liberty interests were violated when she was assigned "degradingly inferior" duties.

As we stated in Draghi v. County of Cook, 184 F.3d 689, 693 (7th Cir. 1999),

"The concept of liberty protected by the due process clause has long included occupational liberty--'the liberty to follow a trade, profession, or other calling.'" Wroblewski v. City of Washburn, 965 F.2d 452, 455 (7th Cir. 1992) (citing Lawson v. Sheriff of Tippecanoe County, 725 F.2d 1136, 1138 (7th Cir. 1984)). The

cases have consistently drawn a distinction, however, between occupational liberty and the right to hold a specific job. The due process clause of the Fourteenth Amendment secures the liberty to pursue a calling or occupation, and not the right to a specific job. Wroblewski, 965 F.2d at 455; Lawson, 725 F.2d at 1138. "It stretches the concept too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains as free as before to seek another." Roth, 408 U.S. at 575, 92 S. Ct. 2701.

In her appellate brief, Ulichny initially argues that Defendants-Appellees O'Neill and Flynn stigmatized her by public comments they made. The first comment Ulichny points to is when Flynn, at a Board meeting, stated that he shared concerns regarding Ulichny's "lack of trust."

It is important to note that "not every remark which may arguably affect one's reputation violates due process if made by a government official without a hearing, for the fourteenth amendment protects only against charges that 'might seriously damage [one's] standing and associations in [the] community.'" Hadley v. County of DuPage, 715 F.2d 1238, 1245 (7th Cir. 1983) (quoting Lipp v. Bd. of Educ. of City of Chicago, 470 F.2d 802, 805 (7th Cir. 1972)). Thus, this court "has taken the position that a mere charge of mismanagement is not enough to give rise to a liberty interest requiring a hearing." Id. "Liberty is not infringed by a label of incompetence or a failure to meet a specific level of management skills, which would only affect one's professional life and force one down a few notches in the professional hierarchy." Lashbrook v. Oerkfitz, 65 F.3d 1339, 1348 (7th Cir. 1995).

At the School Board meeting when Flynn stated that he shared some of the parents' concerns regarding Ulichny's "lack of trust," he stated that he also shared some of the concerns regarding teacher morale, the public's regard for the administration, an unsettled teachers' contract, teachers' regard for the board, and teacher turnover. As such, Flynn's comments can hardly be called so damaging to Ulichny's reputation that she was prevented from obtaining employment in her chosen field. Rather, we are of the opinion that Flynn's comments were nothing more than a list of concerns that he had and not a direct attack against Ulichny's moral character. See, e.g., Strasburger v. Bd. of Ed., Hardin County Comm. Unit Sch. Dist. No. 1, 143 F.3d 351, 356 (7th Cir. 1998). This is further supported by the fact that at the same School Board meeting, Flynn publicly supported Ulichny's

decision to call the police during the wedgie incident.

In her appellate brief, Ulichny also complains that "another newspaper reported that O'Neill said that parents have said that Ulichny 'lies' and that Ulichny 'should not be allowed to interact with kids.'" However, when O'Neill made this statement he was not a member of the School Board and, as such, these statement were not statements "from the mouth of a public official." Strasburger, 143 F.3d at 356. As such, O'Neill's statements, while not a member of the School Board, cannot form the basis of Ulichny's liberty interest claim./17

E.   Qualified Immunity

Finally, we hold that the individual defendants are entitled to qualified immunity./18

In Hinnen v. Kelly, 992 F.2d 140, 142-43 (7th Cir. 1993), we explored the parameters of qualified immunity which we reiterate only briefly here. Basic is that government officials performing discretionary functions are not subject to liability unless their actions violate clearly established statutory or constitutional rights then known to a reasonable officer. That clearly established right must be one established in a particularized sense. This requires more than a general violation of the Fourth Amendment. "It is an objective fact-specific question which depends upon the clearly established law at the time." Id. at 142 (citation omitted). It is not necessary for liability, however, that an identical factual situation had been legally decided adverse to the officer. The officer's actions are to be considered in light of the particular circumstances the officer faced at the time. When the specific facts in the particular instance are determined then those facts are to be compared to the law existing at the time to see if clearly established law was violated. "A right is not clearly established if officers of reasonable competence could disagree on the issue." Id. at 143 (citation omitted). Officers under this standard may be protected from liability for objectively reasonable decisions, even if wrong. Therefore, as we held in Jones v. City of Chicago, 856 F.2d 985, 994 (7th Cir. 1988), qualified immunity is not forfeited unless "no reasonable officer could have mistakenly believed" that the conduct was unlawful.

Saffell v. Crews, 183 F.3d 655, 658 (7th Cir. 1999).

In this case, the individual defendants had reason to believe that their actions, although

cowardly, were lawful. This is so because a federal district court in Wisconsin had already held that under a very similar factual situation, the plaintiff had neither a property right in his job as principal nor was his reputation so infringed that his federal liberty interests were violated. Terry, 803 F. Supp. at 1522-26. Additionally, this court reaffirmed such a conclusion in Bordelon, where we held that a principal in Chicago, albeit for different reasons, did not have a protectable property or liberty interest in his position. Bordelon, 233 F.3d at 530-31. Given Terry and Bordelon, we refuse to hold that a reasonable school official would have known that reassigning Ulichny different duties would have violated the 14th Amendment and forced Ulichny to resign.

Even though we have concluded that as a matter of law Ulichny's claims cannot proceed in federal court, we are sympathetic to her case. We are certainly aware of the fact that teachers today have a hard enough job attempting to instruct young, undisciplined children without worrying that parents, school administrators, or school boards will abandon them as soon as their well-intended actions become politically unpopular. Those individuals given the awesome responsibility of educating the children of this nation must be allowed to protect their wards while imposing the type of discipline they reasonably deem proper without becoming a scapegoat. It is very clear to this court that the Merton School Board and the District Administrator could have avoided this situation by standing firmly in support of this school principal whose actions were well calculated in notifying local law enforcement authorities, especially in this day of excessive litigation as a result of growing concern over school violence. Although Ulichny in all probability had room for improvement as a principal, the Board and Administrator would have been well advised to stand firmly in support of her, especially given the fact that after one young child was violently assaulted by five or six children Flynn approved Ulichny's suggestion to call the police./19

Rather than serving the needs of the many, it is evident to us that the Merton School Board, in a cowardly fashion, abandoned a school principal who was acting in the best interest of the children when notifying the police. Had she not notified law enforcement and the child had suffered any type of serious injury, the school district could very well have been involved in a million dollar lawsuit for lack of proper supervision on its school yard during school hours.

Whether the Board abandoned one of its principals for political reasons or because it got tired of fighting a vocal minority is not our concern, but it certainly did not display courage or fairness. What is clear however is that Ulichny, although obviously the sacrificial lamb of the Board, does not have a remedy in federal case law at this time.

The decision of the district court must be

AFFIRMED.

FOOTNOTES

/1 Ulichny also alleged several state law claims.

/2 The judge then remanded Ulichny's state law claims to Wisconsin state court.

/3 Wis. Stat. sec. 118.24 (1999) (School district administrator), states, in relevant part:

(1) A school board may employ a school district administrator, a business manager and school principals and assistants to such persons. The term of each employment contract may not exceed 2 years. A contract for a term of 2 years may provide for one or more extensions of one year each.

* * * * * *

(3) The principal shall perform such administrative and instructional leadership responsibilities as are assigned by the district administrator under the rules and regulations of the school board.

* * * * * *

(6) The employment contract of any person described under sub. (1) shall be in writing and filed with the school district clerk. At least 4 months prior to the expiration of the employment contract, the employing school board shall give notice in writing of either renewal of the contract or of refusal to renew such person's contract. If no such notice is given, the contract then in force shall continue in force for 2 years. Any such person who receives notice of renewal or who does not receive notice of renewal or refusal to renew the person's contract at least 4 months before the contract expiration shall accept or reject the contract in writing on or before a date 3 months prior to the contract expiration. No such person may be employed or dismissed except by a majority vote of the full membership of the school board. Nothing in this

section prevents the modification or termination of an employment contract by mutual agreement of the parties.

(7) Prior to giving notice of refusal to renew the contract of any person described under sub. (1), the employing board shall give such person preliminary notice in writing by registered mail at least 5 months prior to the expiration of such contract that the board is considering nonrenewal of the contract, and that if such person files a written request with the board within 7 days after receiving such notice, the person has the right to a hearing before the board prior to being given written notice of refusal to renew the contract. The written request for a hearing shall include a statement requesting either a private hearing or a public hearing before the board. Section 118.22 does not apply to such a proceeding. If a hearing concerning nonrenewal of the contract is requested, the reasons upon which the board is considering nonrenewal may also be requested and the board shall furnish such reasons before the hearing in writing.

/4 Teachers and staff filled out "feedback forms" on their impressions of Ulichny's performance.

/5 The Board extended Ulichny's original contract.

/6 D.A.R.E. is an acronym for law enforcement's "Drug Abuse Resistance Education." D.A.R.E. is designed to educate students about the dangers of drug abuse and to create relationships between law enforcement officers and students. Deputy Haizel had a long relationship with the students at Merton School.

/7 The disorderly conduct citations were later dismissed on the condition that the boys apologize to the victim and perform five hours of community service.

/8 Ulichny also decided to suspend the students for a short period of time. The misguided parents of some of the children felt that the incident was being blown out of proportion and threatened that they were going to complain to the School Board.

/9 The same basic information was also sent to all the parents of students in Merton.

/10 Ulichny received poor evaluations (in the form of a memo from Flynn) on May 12, May 15, May 22, June 1, June 7, August 3, and August 11, 1998.

/11 Ulichny was absent from work due to illness from September 11, 1998 through November 19, 1998.

/12 Ulichny also alleged numerous state law violations.

/13 We, like the district court, give no weight to Ulichny's attempt to create a question of fact by submitting the affidavit of Charles Hilston, a proposed expert in the operation of Wisconsin school districts. Hilston's affidavit basically states that he believes that the duties taken away from Ulichny are duties normally assigned to a school principal and that school principals usually have a right to perform those duties. Not only does Hilston's affidavit run contrary to the contract and Wisconsin statutes (remember, sec. 118.24(3) grants the school board broad discretion in assigning particular duties to a principal), but the affidavit also fails to state what school manuals, statutes, or recognized educational treatises Hilston relied upon to reach his conclusions.

/14 Ulichny also argues that the defendants violated her property rights because they discontinued her pay after she claimed that she was constructively discharged. Such a claim is meritless because there is no legal obligation to continue to pay an individual who no longer works for you.

/15 "The term 'constructive discharge' refers to the situation in which an employer, without firing an employee, makes [her] working conditions so miserable that it drives [her] to quit." Hunt v. City of Makham, 219 F.3d 649, 655 (7th Cir. 2000).

/16 As courts have noted, "'[a]n employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.'" Yearous v. Niobrara County Mem'l Hosp., 128 F.3d 1351, 1357 (10th Cir. 1997) (quoting Tidwell v. Meyer's Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996)).

/17 Given the fact that this court has already determined that Ulichny was not constructively discharged, we need not address her argument that her duties were so inferior that she was stigmatized in violation of her federal liberty interests.

/18 Of course, qualified immunity is unavailable as a defense to the School Board. Brokaw v. Mercer County, 235 F.3d 1000, 1022 n.18 (7th Cir. 2000).

/19 The actions of these school officials

certainly does not bring to mind the support and
leadership ideals made famous by individuals like
the late Vince Lombardi and George Patton.